## THE PEOPLE *vs.* JAMES M. COOK.

14 259
69h 600
14 259
86h 4
14b 259
46ap147

If inspectors of elections come into office by color of title, that is sufficient to constitute them officers *de facto*. And if they are officers *de facto*, their omission to take the oath prescribed by the statute will not invalidate an election held by them.

Acts done by those who are officers *de facto* are good and valid as regards the public, and third persons who have an interest in their acts; and their title to the office cannot be inquired into collaterally. This doctrine has been applied to cases where the whole official duty of the officer, in its nature, consists in the performance of a single act.

But the mere claim to be a public officer, and the performance of a single act, will not, it seems, constitute an individual an officer *de facto*. There must be some color of an election or appointment, or such an exercise of the office, and an acquiescence on the part of the public, as would afford a reasonable presumption of at least a colorable election or appointment.

It is a general rule, in relation to public officers, that they may establish their official character by proving that they are generally reputed to be, and have acted as, such officers, without producing their commission, or other evidence of their appointment.

The certificate of a town clerk, showing that particular persons were declared duly elected inspectors of elections, and that no others have been elected in their stead; and that no appointment of any others has been filed in his office, is not evidence for any purpose.

Statutes directing the mode of proceeding by public officers are directory, and a strict compliance with their provisions is not essential to the validity of the proceedings, unless it be so declared in the statute.

Within this principle, where a statute directs a public officer to do a thing within a certain time, without any negative words restraining him from doing it afterwards, the naming the time will be regarded as directory merely, and not as a limitation of his authority.

This rule has been very steadfastly adhered to, by the courts, in all cases where certain acts are directed to be done, by public officers, within a stated time, and in a particular manner, when those acts are of a public character, and concern the public interests, or when the rights of third persons are concerned. *Per* MASON, P. J.

The rule should be applied to inspectors of elections, and to omissions, by them, to comply with the requirements of a statute, occurring through ignorance or inadvertence.

The fact that inspectors of elections, and the clerks, are sworn, not upon the bible, but upon a book of a different description, will not invalidate the election.

Nor will the fact that the inspectors proceeded with the election, for a short time, with only one clerk, render the election void, in the absence of any evidence of fraud; nor that a person who was not a member of the board, or

The People *v.* Cook.

a clerk, sat by the table, and kept a list of the voters, and copied some from the poll list; nor that while two of the inspectors were gone to their breakfast, the remaining inspector appointed another person an inspector, and administered to him the official oath; the two proceeding to act as inspectors, during the absence of the others; nor that the person thus appointed assisted while the other inspectors were eating their dinner, in the same room where the polls were held, and that he assisted by the request of the others, for a short time, while all three of them were present; nor that the polls were held open some ten or fifteen minutes after sundown, and that a few votes were received after that time; nor that the certificate of the canvass was made in a private room, or that it was not made immediately.

Where, upon the trial of an action in the nature of a *quo warranto*, it is not shown or alledged that any illegal votes were received, or any legal votes were rejected, at the election at which the defendant claims to have been elected; and there is no evidence of fraud, in respect to the conducting of the poll, or canvassing the votes; but on the contrary it appears by the evidence of the inspectors of elections that there was no intentional irregularity, or wrong, in any part of the proceeedings, the judge is right in refusing to submit the question of fraud to the jury.

A certificate of the appointment of persons as inspectors of elections, proved by the town clerk to be in the handwriting of his predecessor in office, and to have been taken from the files of the town clerk's office and brought to court, and which paper is signed by the clerk, supervisor, and a justice of the town, and filed on the back in the handwriting of the former town clerk, is the best evidence of the appointment of such inspectors, and is sufficiently proved.

Whether such certificate is filed on the day of the election, or afterwards, is immaterial; the statute being silent as to the time of filing papers of that nature.

The fact that a board of canvassers proceed for a time, in receiving votes, without clerks—one of the inspectors acting as such, in consequence of their inability to procure suitable clerks—will not invalidate the election.

Nor will the fact that, during a part of the time, there were four inspectors acting at the polls, and that the returns were signed by four—although an irregularity—affect the election.

In an action to determine the right to an office, the court and jury may look beyond the returns, and even beyond the ballot boxes, if necessary, to ascertain the truth. It may therefore receive evidence as to the *intention* of the voters.

It is immaterial how many names a ballot contains, if it does not contain more names for the same officer than there are officers to be elected, at the election. Accordingly, where a ballot for state officers, at a general election, was correct in form, and contained no more names than there were persons

The People *v.* Cook.

to be chosen, but there was at the bottom, " For county judge, E. G ;" *Held*, that this did not render the ballot void.

On the trial of an action in the nature of a *quo warranto*, to determine the right to an office, where the question was whether votes, given for " B. C. W. jun." and " B. W." were intended to be given for, and should be allowed to B. W. jun., and the evidence, unexplained and undisputed, concurred to identify B. W. jun. as the person for whom the votes were intended, and to establish the intention of the electors who voted those ballots to vote for him, and there was no disputed fact for a jury to find, upon that branch of the case; it being wholly a matter of inference, or legal intent, to be drawn from undisputed facts; *Held*, that the judge was right in refusing to submit the question to the jury.

The addition of " Junior" to a name, is mere matter of description, and forms no part of the name.

Neither is a middle letter, between the christian and surname, any part of the name; for the law knows of only one christian name. And where it appears that a middle letter was inserted in a name, upon a ballot, by mistake, it may be rejected.

The duties of inspectors of elections are partly judicial and partly ministerial. In determining whether ballots were intended for a given candidate, or not, they act in a judicial capacity; and unless their determination is impeached, by some legitimate evidence, it must be allowed to stand.

The fact that voters, challenged at an election, are, by mistake sworn upon a book other than the bible, both they and the inspectors supposing it to be a bible, will not render the election invalid.   The most that can be claimed, in such a case, is that the illegal votes should be rejected.

Where the poll lists disagree with each other, and the inspectors draw out enough votes to reduce the ballot to the lowest poll list, this, although an irregularity, will not invalidate the election.

The omissions of officers conducting elections, through negligence, mistake, or inadvertence, to comply with all the directions of the statute, ought not to be allowed to disfranchise the electors.

The proper rule upon this subject is not to permit such omissions, whether they are the result of negligence, ignorance, mistake or fraud, to invalidate the election, whenever, by going behind the returns, the canvass, or even the ballot boxes, the true state of the canvass or ballot can be obtained, and the expressed will of the electors ascertained.

THIS was an action in the nature of a *quo warranto*, brought for the purpose of testing the right of the defendant to the office of treasurer of the state.   The complaint was served on the 1st day of January, 1852.   It alledged that the office of state treasurer had been and still was a public office of great trust and pre-eminence, and that the defendant, James M. Cook, without

any legal warrant, authority or right whatsoever, had, for the space of five hours and more, last past, and since the first day of January, 1852, held, used and executed the said office of treasurer of the state of New-York, and still did hold, use and execute the same, and without any legal warrant or authority, had claimed, used, received and enjoyed all the rights, franchises, fees and emoluments belonging or appertaining to the said office, which rights and franchises, he, the said James M. Cook, had usurped and unlawfully held and exercised, and still did unlawfully hold and execute. That Benjamin Welch, jr., of the county of Erie, was rightfully entitled to the said office of treasurer, and to all the rights, franchises and emoluments thereof, and had been so entitled from and since the first day of January, 1852; and in order to state and set forth the right and title of the said Benjamin Welch, jr. thereto, and that the said James M. Cook had no right or title thereto, the plaintiffs further stated and alledged that, at a general election held throughout the state of New-York, according to the constitution and laws thereof, on Tuesday, the fourth day of November, in the year 1851, for the election, among several other officers of the state, of a treasurer of the said state, to hold his office for two years, commencing on the first day of January, 1852, he, the said Benjamin Welch, jr. was, by the greatest number of votes given at the said election for treasurer of the said state, duly elected and chosen such treasurer, for the term aforesaid. Wherefore the said plaintiffs prayed judgment, that the defendant had usurped and unlawfully held and exercised the said office of treasurer of the state of New-York, and the rights and franchises appertaining thereto, since the day aforesaid, and still did so unlawfully hold and exercise the same, and that he be ousted and removed therefrom; and further judgment, that the said Benjamin Welch, jr. was entitled to the said office, and the rights, franchises and fees thereof, and had been so entitled since the day aforesaid; and that the defendant should pay to the plaintiffs the damages, costs and expenses in this action.

It was stipulated between the parties that the defendant might, under a general denial of the allegations of the complaint,

The People *v.* Cook.

give in evidence upon the trial any matter which could be proved, if set up specially in the answer and put in issue or avoided by the reply, upon giving written notice ten days before the circuit for which the cause should be noticed for trial.

The defendant, by his answer, denied that he had usurped or unlawfully held, used, or occupied the office of treasurer; or had claimed, received, or enjoyed the fees and emoluments appertaining thereto, without legal authority, warrant, or right. But on the contrary he alledged that, at a general election held throughout the state, pursuant to the constitution and laws thereof, on Tuesday, the fourth day of November, 1851, for the election, among several other officers, of a treasurer of the said state, to hold his office for two years, commencing on the first day of January, in the year 1852, the defendant was duly elected to the said office of treasurer; he having received the greatest number of votes; and having been declared by the board of state canvassers duly elected to the said office. That a certificate of their determination was duly made and signed by the said board, and recorded in the office of the secretary of state; that on the 13th of December, 1851, the secretary of state transmitted to the defendant a copy of the said certificate. And that he, the defendant, thereupon, on the 15th day of December, 1851, gave the security required by law, and on the 31st day of the same month, took and subscribed the oath of office required by the constitution and laws of the state.

And the defendant further alledged, on his information and belief, that at the aforesaid general election, the greatest number of votes duly given by the qualified electors, who voted for any person for the office of treasurer of said state, were given for him, the said defendant, for such treasurer. By virtue whereof, and of the proceedings, canvassers' statements and certificates thereinbefore stated, and by that warrant he, the defendant, as he was informed and believed, became and was, on the first day of January, 1852, and from thence continually had been, and still was, treasurer of the said state; and by that warrant he, the defendant, for and during the time specified in the said complaint, and ever since, had held, used and executed the said office

of treasurer of the said state, and still did use, hold and execute the same; and as he was informed and believed, it was lawful for him so to do.

Under the stipulation between the parties, the defendant served a notice with his answer, that on the trial of the cause he would give in evidence the following facts, viz: that at the general election held in this state on the fourth day of November, 1851, the irregularities hereinafter mentioned occurred, affecting the choice of a state treasurer. *First.* That in the first election district of the first ward of the city of New-York, the inspectors of election, or the persons who acted as such, did not take and had not, at the time of said election, taken their oath of office. *Second.* That in the second election district of the city of Williamsburg, the election polls were not opened until 8 o'clock, A. M., and long after sunrise; that, in consequence of such delay, a large number of the qualified electors of the said district left the said polls under the impression and belief that no election would be held in the said district, and not being informed of the polls being opened, did not vote at the said election; that no clerk was sworn in, or appointed, until 9 o'clock; that only one clerk acted until half past 9 o'clock, and only one poll list was kept up to that time; that three persons were sworn in by the town clerk, and acted as inspectors of election, who had not been elected or appointed as such inspectors; that afterwards, and about half past 10 o'clock, A. M., two other persons who had been elected inspectors appeared, and, with the three persons aforesaid, acted as inspectors during the remainder of the day; that after the polls were closed, another person was sworn in as an inspector of election, and assisted in canvassing the votes, in connection with the five persons aforesaid; that the poll lists did not agree by fifty votes or more, and were not made to agree; that the poll list having the smallest number of names on it was taken as correct, and a sufficient number of ballots was drawn from the box to make the number therein agree with said lists; that the inspectors divided themselves into two sets of canvassers; that part of the inspectors canvassed part of the ballots, and part canvassed

another; that the inspectors adjourned the canvass and proceeded to the town clerk's office, some distance from the place of holding said election, to make out the canvass from the poll lists and from memoranda made by them; that no regular or legally appointed inspectors signed the returns; that no record of challenged votes was kept or returned to the town clerk's office. *Third.* That the returns from district No. 3, in the town of Cattskill, were improperly rejected by the county canvassers. *Fourth.* That the inspectors of elections in the western district of the first ward of the city of Buffalo, were illegally sworn in upon Watts' Psalms and Hymns, and not upon the Bible; and that with full knowledge of the fact, the inspectors swore voters on the same book, viz. Watts' Psalms and Hymns, and not on the Bible; such voters also having full knowledge of the fact that the oaths were administered on the said book, and without having desired to be sworn without the use of the Bible. *Fifth.* That in the town of De Peyster, St. Lawrence county, the inspectors of election were not sworn in at all; or, if at all, not until after a large number of votes had been given; and that there was but one clerk of the polls, and he was not sworn in any form. *Sixth.* That in the town of Greenbush, Rensselaer county, polls were held at what purported to be a third election district, which district was never legally formed. *Seventh.* That in the county of Herkimer, the ballots for state officers contained also the names of persons voted for as county judge, and the names of persons voted for to fill other offices, which by law could not be placed upon the ballots for state officers, and were required by law to be placed on other ballots, and that a large number of such ballots for state officers, containing the name of Benjamin Welch, jr. for state treasurer, to the amount of at least five hundred, were illegally canvassed and allowed to him by the county canvassers of said county. That by reason of these irregularities, a large number of votes, in several instances above mentioned, which should have been allowed to James M. Cook, were not allowed to him; and that in other instances, above mentioned, a large number of

votes were allowed to Benjamin Welch, jr. mentioned in the complaint, which ought not to have been allowed to him, &c.

The plaintiff put in a reply, in which issue was taken upon most of the allegations of sworn matter in the answer. And they averred that the board of county canvassers of the county of Essex did not estimate the votes given for the office of treasurer, at the election aforesaid, in the second election district, in the town of Chesterfield, in the county of Essex; nor did they, in their statement of the votes of said county made by them, include or allow therein the votes given at said election, in that district, for the office of treasurer. And that a large number of votes were given at the said election, in said district, for Benjamin Welch, jun., for said office, and exceeding those given for any other person, for said office, by at least thirty votes. Nor did the board of county canvassers of the city and county of New-York estimate the votes given for the office of treasurer, at the election aforesaid, in the second election district, in the fourteenth ward of the city and county of New-York, nor did they, in their statement of the votes of said city and county, made by them, include or allow therein the votes given at said election, in said district, for the office of treasurer; and that a large number of votes were given in said district for Benjamin Welch, jun., for said office, and exceeding those given for any other person, for said office, by at least two hundred and seventy votes. And the plaintiffs denied that the statements alledged in the answer, to have been made by the board of county canvassers, of the several counties, were correct.

And the plaintiffs stated on their information and belief, that the proceedings of the board of state canvassers, alledged and set forth, in the answer of the defendant and of the secretary of state, and of the defendant based thereon, were imperfect, irregular, defective, erroneous and void, and that they did not confer upon the defendant any right or title to said office of treasurer, in many respects, and among others, in that the said board of state canvassers did not include, in their statement and certificate, the votes given for treasurer, in the second election district of the fourteenth ward of the city of New-York;

nor did the said board of state canvassers include, in their statement and certificate, the votes given for treasurer, at said election, in the second election district of the town of Chesterfield, in the county of Essex; nor did they include, in their statement and certificate, the following votes cast in their respective counties, hereinafter mentioned, each and every one of which votes were, by the electors casting the same, intended for the said Benjamin Welch, jr. namely : one vote for B. Welch, in the county of Chenango; sixty-eight votes for Benjamin Welch, in the county of Chemung ; one vote for Benjamin Welch, in the county of Kings ; one vote in the county of Livingston, for B. J. Welch, and one vote in the same county for B. Welch; one vote in the city of New-York for B. Welch; thirty-two votes for Benjamin C. Welch, jr., in the county of Ontario ; one vote, in the county of Saratoga, for Benjamin Welch ; and forty-seven votes for Benjamin Welch, in the county of Tompkins. And the plaintiffs further stated and averred, that all the votes so given, and intended for the said Benjamin Welch, jr., for said office of treasurer, in the several election districts and counties mentioned, and the votes given for said Benjamin Welch, jr., in the other election districts of the state of New-York, for said office, were enough to elect him, by the largest number of votes, given at the said election, to the office of treasurer of said state.

The cause was tried at the Tompkins circuit in March, 1852, before Justice Gray and a jury.

The counsel for the plaintiffs proved, that, at the general election, held on the fourth day of November, 1851, the following votes, for the office of state treasurer, were given in the several election districts of the state, and were canvassed, by the state canvassers, and were allowed by them to the following persons, viz : for Benjamin Welch, junior, two hundred thousand four hundred and sixty-five (200,465) and for James M. Cook, two hundred thousand six hundred and ninety-three (200,693,) and that there were also given, in the said election districts, at the said election, for such office, the following votes in the following counties ; which votes were canvassed as aforesaid, but were

not allowed, by the state canvassers, either to Benjamin Welch, junior, or to James M. Cook, viz: in Chemung county, for Benjamin Welch, 68; in Chenango, for B. Welch, 1; in Kings, for Benjamin Welch, 1; in Kings, for J. M. Cook, 1; in Livingston, for B. J. Welch, 1; in Livingston, for B. Welch, 1; in Livingston, for J. W. Cook, 2; in New-York, for B. Welch, 1; in New-York, for Cook, 2; in Ontario, for Benjamin C. Welch, junior, 32; in Saratoga, for Benjamin Welch, 1; in Saratoga, for James Cook, 1; in Suffolk, for James A. Cook, 15; in Tompkins, for Benjamin Welch, 47; in Yates, for John M. Cook, 1. The counsel for the plaintiffs then proved, that no returns from the inspectors of election of the second election district of the town of Chesterfield, in the county of Essex, of the votes given in said district, at the aforesaid election, were canvassed or allowed by the county canvassers, of the said county of Essex, in their canvass of the votes of said county; that a return of the votes given in said district, regular on its face, was presented and offered to the board of county canvassers of the county of Essex, by the supervisor of the town of Chesterfield, to be canvassed; which said original return was produced, proved, and offered in evidence, and was signed by Seymour Ames, Jehial Beardsley, and Major B. Weston, as inspectors of election of said election district; whose signatures thereto were proved to be genuine; by which it appeared, that the whole number of votes given in that district for the office of treasurer of the state, at the said election, was 73, of which there were, for Benjamin Welch, junior, 49, and for James M. Cook, 24; and it was proved, that this paper was the only return from that district of the votes given at said election. To the admission of this paper, the defendant's counsel objected, on the ground, that there was no evidence that the persons who signed said paper were inspectors of election for said district. The judge reserved his decision on this objection; and the counsel for the plaintiffs then proved, by the testimony of Jesse Gay, that he was present from between 9 and 10 o'clock in the morning, when the polls were opened, and was there until they closed. The persons who signed the return, officiated as inspectors all day. No question

was raised by any one as to their right to act. Nobody claimed to be inspectors that day, except these men.. The question as to who were the inspectors, was talked of in the morning, before the polls were opened. It was conceded, on all sides, that Ames was an inspector. Finch said so, and others. Some one was sent for Ames, because he was reputed to be an inspector. Ames came, and proceeded to organize the board, acting as inspector. He appointed the others. They appointed clerks of the polls. There were oaths administered. The judge thereupon overruled the objection of the defendant's counsel, and permitted said paper to be read in evidence; to which decision, the defendant's counsel excepted. The counsel for the plaintiffs then proved, that the votes given at the polls, in the second election district of the fourteenth ward of the city of New-York, were not canvassed or allowed by the board of county canvassers of the county of New-York, and were not included in the return of votes of said city and county of New-York, made and returned to the secretary of state, comptroller and governor, to be canvassed by the state canvassers; nor were they canvassed by the state canvassers; and that the return from said district, of the inspectors of election thereof, was rejected by the said board. To these returns no specimen ballot was attached. The said counsel also gave in evidence two original duplicate returns of the inspectors of election of said last mentioned district, signed by Abel Price, Francis Gilmore and James O'Neill, inspectors; one of which had been delivered to the supervisor of said ward, and the other had been filed in the clerk's office of the said county of New-York; by which returns, it appeared that, in said district, at the aforesaid election, the whole number of votes given and received at said general election, in said election district, for the office of treasurer of the the state, was 398; of which the said James M. Cook received 66 votes for the office of treasurer of the state, and the said Benjamin Welch, junior, received 332 votes for the same office. The counsel for the plaintiffs then proved, by the statement of the board of canvassers of Ontario county, that the whole number of votes given in that county, for the office of state treasurer,

was 6591; of which 3664 were for James M. Cook, 2827 for Benjamin Welch, junior, and 32 for Benjamin C. Welch, junior; and, by the return of the inspectors of election of the town of Richmond, in said county, that the whole number of votes for state treasurer, in that town, was 276, of which 119 were for James M. Cook, 109 for Benjamin Welch, junior, 32 for Benjamin C. Welch, junior, which were the same votes stated in the county canvassers' statement to have been given for Benjamin C. Welch, junior, and which were contained in the statement of the board of state canvassers, and canvassed, and allowed separately to Benjamin C. Welch, junior, and not to Benjamin Welch, junior. The counsel for the plaintiffs then proved by Jacob J. Madison, that he printed the greater part of the ballots used in Ontario county, at the aforesaid election, containing the names of the nominees for state officers nominated by the democratic state convention at Syracuse. The said counsel produced a printed sheet, containing six of said ballots; all of which embraced the names of such nominees and of their respective offices; on one of which tickets the name of Welch was printed Benjamin C. Welch, junior, and not Benjamin Welch, junior. The compositor put the "C." in the name of Welch in all the ballots in the form; the witness read the proof and marked out the "C's," and returned the sheet to the compositor for correction. There were six of the state tickets on the sheet, and he corrected all but one. One sixth of the tickets would have the "C" in them. It was further proved by the plaintiffs' counsel, that Joseph Garlinghouse got from said Madison one package of these ballots, printed by him, and that Dr. Simmons got another package, both of which were taken to the polls of the said town of Richmond, and there distributed; that Benjamin Welch, junior, was the democratic candidate for state treasurer, and had been nominated as such at the democratic conventions, both in 1849 and in 1851; that the said Madison edited a democratic paper, and knew of no other democratic candidate for treasurer than Benjamin Welch, junior; that he had, at the time of the election, never known or heard of any man by the name of Benjamin Welch, or Benjamin C. Welch, junior,

The People *v.* Cook.

except Benjamin Welch, junior, of Buffalo ; that said Benjamin Welch, junior, was known to be the regular democratic candidate for treasurer at said election ; that he knew of no other democratic candidate for treasurer ; and that said Madison furnished the tickets for the towns of Naples and Gorham, and that all the ballots printed by him were printed on the same form, and were of the same emission. The counsel for the plaintiff then further proved, that the whole number of votes given in the county of Chemung for state treasurer, at the aforesaid election, was 4364, of which there were for Benjamin Welch, junior, 2445, for James M. Cook, 1850, and for Benjamin Welch, 68 ; that in the first election district of the town of Chemung, in said county of Chemung, 16 votes were given at said election for Benjamin Welch, and were so returned by the inspectors of that election district, which votes were canvassed, and were allowed separately to Benjamin Welch, and not allowed to Benjamin Welch, junior, both by the county canvassers and by the state canvassers ; and the said counsel gave in evidence the original return of the inspectors of election in the town of Cayuta, in said county of Chemung, ·by which it appeared that, at said election, the whole number of votes given for the office of state treasurer in said town was 203, of which there were for Benjamin Welch, junior, 109 ; for James M. Cook, 42, and for Benjamin Welch, 52. The plaintiffs' counsel then proved by Julius Taylor that he resided last fall in Elmira, Chemung county ; that he was a printer, and printed the ballots used in Cayuta and Chemung, in said county, at the last general election ; that he printed the usual number, and they were taken from the office to go into the towns ; on some of the tickets the "junior," in the name of Benjamin Welch, was omitted, through inadvertence. Four tickets were printed on a sheet, and this omission occurred once in every fourth ticket ; the ticket was printed for the ticket nominated at Syracuse, by the democratic state convention ; there were about six hundred worked off and sent out before the witness discovered the mistake ; that he knew Benjamin Welch, junior, was a candidate for state treasurer, nominated at Syracuse in 1849, and again in 1851 ; that he knew of no other

Benjamin Welch, and heard of no other man as a candidate for that office, on the democratic side.

The plaintiffs' counsel having rested, the counsel for the defendant gave in evidence a certified copy of the certificate of the board of state canvassers, stating that, at the aforesaid election, James M. Cook had been, by the greatest number of votes, duly elected to the office of treasurer of said state ; and also a certified copy of the official bond and oath of the defendant.  The defendant's counsel then proved, that, at the said election, in November, 1851, there were 276 votes cast for treasurer of said state, at the election polls in the third district of the town of Catskill, in Greene county, of which there were, for James M. Cook, 191 ; and for Benjamin Welch, junior, 85 ; that the returns of the inspectors of election of this district were duly made and filed, and that these returns were rejected, and said votes were not canvassed or allowed by the county canvassers of Greene county, or by the state canvassers ; that there was a controversy before said board of county canvassers in relation to the legality of these returns, and testimony was taken by a committee of said board ; that a specimen ballot was attached to these returns, but that the returns did not state how many of such ballots were voted.  The defendant's counsel then proved, in relation to the election held at the polls in the second district of the fourteenth ward of the city of New-York, that Abel Price, Francis Gilmore and James O'Neill were the inspectors of election in that district, at said election, and acted as such ; that the board of inspectors of said district was organized as follows : said Gilmore asked John Heaney (who kept the house where the polls were held) for a Bible, and said Heaney brought a book and handed it to said Gilmore ; that this book was not, and did not contain, the Bible, or the Gospels ; but was a copy of a French instruction book, entitled " Olendorf's new method of learning to read, write and speak French ;" that said Gilmore then administered the official oath of inspectors of election to said Price and O'Neill ; and O'Neill then administered the like oath to said Gilmore ; that said oaths were administered by the persons who took the same, putting their hands on and kissing said

The People *v.* Cook.

book; and that these were the only official oaths taken by said inspectors; that this book was believed, by said inspectors, at that time, to be a Bible; that immediately afterwards, Michael O'Connor was appointed a clerk of the polls, and took the official oath, in the same manner on said book; and that neither said inspectors, nor said clerk, requested to be sworn otherwise than on the Bible or Gospels, by laying their hands on and kissing the same; and said inspectors and clerk believed said book to be a Bible, and used it in that belief, and did not discover that it was not the Bible, or Gospels, until about ten o'clock in the forenoon, when McLaughlin discovered it to be a copy of Olendorf's book, and it was immediately, after such discovery, removed, and a Bible procured and used in its place; that said inspectors did not, when they appointed O'Connor, appoint another clerk; the reason for which was, that they knew of no person present who was suitable, and who would serve; that the inspectors sent for another person, John Ryan, to come and act as clerk, and announced to the voters that they were anxious to take their votes, but could not, till the other clerk came; that finding the voters very desirous to vote, the inspectors determined to commence taking votes, and did so commence, only one person, said O'Connor, acting as clerk, and only one poll list being kept; that they continued to take votes, in this manner, for an hour and a half, and until twelve persons had voted; that then a boy, by the name of John W. Heaney, 14 or 15 years old, without being sworn, kept a list on paper, for half an hour; that said boy commenced keeping the other poll list, copying, from the list kept by O'Connor, such names as were already entered, and entering others as the electors voted, and continued to do so until half past nine, at which time said John Ryan came, there being then sixty names of voters entered on the poll lists; that said John Ryan was then appointed a clerk of the polls, took his official oath on the Bible, and acted as such clerk during the remainder of the day; that about ten o'clock in the forenoon, it was discovered by the inspectors that said book on which they had been sworn was not a Bible, and thereupon a Bible was procured, and used by said inspectors for the rest of

the day in administering oaths to challenged voters, but that neither said inspectors, nor said O'Connor, were sworn in upon the Bible, or Gospels, or in any other manner than as above mentioned; that before said Bible was procured, two voters were challenged, one by each political party; that the inspectors swore them on said French instruction book, believing it to be the Bible, in the manner above described, and their votes were admitted; that about nine o'clock A. M., Price went to breakfast, and shortly afterwards, and before Price returned, Gilmore went to breakfast; that O'Neill, then being the only inspector present at the polls, verbally appointed William G. McLaughlin inspector; that said McLaughlin took the official oath as inspector, by reading the same from the pamphlet containing the election law and forms, and by kissing the Bible which was held by said O'Neill; that said McLaughlin and O'Neill then proceeded to act, and did act as inspectors, and McLaughlin received and deposited ballots for half an hour, and until Price returned; that upon the return of Price, said O'Neill, McLaughlin and Price continued to act as inspectors, receiving and depositing ballots, until Gilmore returned, which was about five minutes after the return of Price, when said McLaughlin went away and ceased to act as inspector; Gilmore then recommenced acting as inspector with said Price and O'Neill; that McLaughlin had been inspector in said wards for a great number of years, and was invited to be present by each and all the said inspectors, who had never before acted in that capacity, to aid them with his advice; that when McLaughlin left, Price requested him to come back and relieve the inspectors, so that they might go to dinner; that about one o'clock McLaughlin returned and acted again as inspector with Price and Gilmore, while O'Neill was eating his dinner in the back part of the same room where the polls were held, behind the table on which were the ballot boxes; that after O'Neill had finished his dinner and had recommenced to act as inspector, Gilmore and Price went away to their houses to dinner, and McLaughlin continued to act as inspector, and acted in company sometimes with one and sometimes with two of the regular inspectors, until all three of the regular inspectors had

The People *v.* Cook.

returned, when he ceased to act as inspector for the time, and went away; and that near the time of closing the polls, McLaughlin returned to the poll room. It was proved that one of the inspectors, Price, upon looking at his watch, discovered it was sundown, and so informed McLaughlin and O'Neill, and said it was time to close the polls; the inspectors, McLaughlin acting as one of the three, then agreed to close the polls, acting upon the idea and belief that it was sundown; they agreed to, and did close the outer door of the large room in which the electors were; prevented all others from coming in, and received the votes of those in the room ready to vote; those in the room ready to vote, voted; some ten or fifteen in all; all was done within ten minutes, and all done after sundown; the polls were then closed; between the time Price announced it was sundown and the time of closing the polls, four persons, including McLaughlin, acted as inspectors a part of the time. It appeared that no legal votes were rejected, and all the legal votes offered were honestly received and placed by the inspectors in the appropriate boxes; that as soon as the last vote was received, the usual proclamation closing the polls was made, and the polls closed; the poll lists were compared, and proper preparations were made for canvassing the votes; the original poll lists were procured and put in evidence on the trial, from which it appeared that they agreed with each other, and with the number of votes given for the state ticket; the inspectors then proceeded to canvass the votes, and canvassed the state box first, and completed that box between nine and ten o'clock that evening, the clerks keeping a tally list of said canvass; after the poll was closed, the policeman present for that purpose, cleared the poll room of all persons present, except themselves, and the policeman, whose business it was to keep clear the place where the inspectors were canvassing; after the state ticket was canvassed, the inspectors repaired to another room, up stairs, for the purpose of completing their canvass and returns; it was after going up stairs that the people were kept out of the room where they were canvassing; that at about daylight, the large room being too cold to be longer occupied by them, they repaired to an upper room in the

The People *v.* Cook.

same house, where a fire was provided, and there completed the canvass, at half past one, P. M., November 5th; that they securely locked up the tally lists, containing the complete results of the election in words and figures, and went to their dinner, and returned the next day and made the returns, the said tally lists being found in the place and in the exact condition in which they were left; the returns then made were produced in court on said trial as evidence, and shown to be correct and fair on the face; that after said returns were made, and one copy taken by O'Neill to the ward canvassers of the 14th ward, on the 6th of November, it was found by said board of ward canvassers that a mistake had been made in setting down the whole number of votes given for judges of the superior court of the city of New-York, and were rejected by said board for that reason; that said error was merely clerical, and did not relate at all to the state ticket; that said inspectors met on the evening of the 6th of November aforesaid, and corrected said error, by inserting the whole number of votes given for said judiciary ticket, but without in any respect changing any result before contained in said returns; that James M. Bard and said McLaughlin were present, and McLaughlin corrected the error; that the returns thus corrected were duplicates, one of which was immediately delivered to James M. Bard, supervisor of said 14th ward, and the other filed in the office of the county clerk of the city and county of New-York, on the 7th day of November aforesaid; that said Bard presented said returns to the board of county canvassers of said city and county, at the canvass of the votes of said city and county, and demanded that the same and the votes therein contained be canvassed by said board of county canvassers, which said board refused to do, and rejected the same. It was not shown or alledged on said trial, that any illegal votes were received, or any legal votes were rejected at said election; but it did appear on said trial, by the evidence of Abel Price, the whig inspector, and by the testimony of said O'Neill, McLaughlin and O'Conner, who were democrats, that there was no intentional irregularity or wrong in any part of the proceed-

The People v. Cook.

ing, and that said votes were fairly and honestly received and accurately canvassed, and returned by said inspectors.

The defendant's counsel then proved that, in the first election district of the town of Little Falls, in the county of Herkimer, the whole number of votes for state treasurer, given at the said election in November, 1851, and returned to and canvassed by the county canvassers, was 598; of which Benjamin Welch, jr. received 321, James M. Cook 267, and Charles D. Miller 10; that in the second election district of said town of Little Falls, the whole number of votes given, returned and canvassed, as aforesaid, for state treasurer, was 245; of which Benjamin Welch, jr. received 182, James M. Cook received 57, and Charles D. Miller received 6; that in the first election district of the town of Herkimer, in the county last aforesaid, the whole number of votes given, returned and canvassed, as aforesaid, for state treasurer, was 255; of which Benjamin Welch, jr. received 141, James M. Cook 43, and Charles C. Bellinger 1; that in the first election district of the town of German Flats, in said county, the whole number of votes given, returned and canvassed, as aforesaid, for state treasurer, was 316; of which Benjamin Welch, jr. received 207, James M. Cook received 107, and C. D. Miller received 2; and the defendant's counsel further proved, that these votes, so returned in said county of Herkimer, were, by the state canvassers, as well as by the county canvassers of that county, canvassed and allowed to the respective candidates above named; and further, that in each of the original returns from the said districts, respectively, made by the inspectors of election therein, of the votes given in said districts respectively, at said election, the specimen ballot attached to said returns, headed or indorsed "state," and having on it the name of Benjamin Welch, jr. for state treasurer, was in the usual form, and contained the names of the democratic candidates for the different state offices, with the following addition, however, at the bottom or end thereof, "For County Judge, Ezra Graves." The defendant's counsel then proved, that the returns of the inspectors of election of the second election district, in the town of Gorham, in the county of Ontario, stated, that at said election,

62 votes were given in that district for Benjamin Welch, jr. for state treasurer, and 62 votes for James M. Cook, for the same office; which votes were canvassed and allowed for the said Welch and Cook respectively, by the county canvassers of said county, and by the state canvassers; and that the specimen ballot attached to said return, headed "state," had thereon, for state treasurer, the name of Benjamin Welch, jr., and that there was written, partly on said ballot and partly on the paper to which it was attached, words indicating that 60 ballots of that kind were received, and no ballot was attached to said return having thereon the name of Benjamin Welch, jr. And the defendant's counsel also proved, that the returns of the inspectors of the town of Naples, in said county, stated that at said election 227 votes were given for Benjamin Welch, jr. for state treasurer, and 191 votes for James M. Cook, for the same office, which votes were canvassed and allowed for said Welch and Cook respectively, by the county canvassers and by the state canvassers; and that the specimen ballot attached to said return, headed "state," had the name thereon, for state treasurer, of Benjamin C. Welch, jr.; and that there were written, partly on said ballot and partly on the paper to which it was attached, words indicating that 209 ballots of that kind were received; and no ballot was attached to said return having thereon the name of Benjamin Welch, jr. That the signatures of the inspectors, to the certificates attached to said returns, from Gorham and Naples respectively, preceded said specimen ballots; and the signatures of the inspectors to the certificates attached to said returns, from Gorham and Naples, also followed said specimen ballots; and it appeared said ballots so attached were a part of those printed by Jacob J. Madison.

The defendant's counsel then, for the purpose of proving who were elected inspectors in the second election district in the town of Chesterfield, Essex county, offered in evidence a certificate of the town clerk of the town of Chesterfield, in the county of Essex, and it was proved that the same was signed by C. D. Beaumont, who was, at the date thereof, town clerk of said town; that the same was filed in the county clerk's office, of

The People v. Cook.

said last mentioned county, November 11, 1851, and was used at the canvassing, in said county, of the votes received at said election. To the admission of this the plaintiffs' counsel objected. The judge sustained the objection, and excluded said evidence, and the defendant's counsel excepted.

The counsel of the defendant then proved, by a certified copy of the statement of the official canvass of the votes of the county of Kings, that the whole number of votes given in said county of Kings, at said election, for the office of state treasurer, was 13,553; of which James M. Cook received 7195 votes, and Benjamin Welch, jr. 6349 votes. Benjamin Welch received one vote, and J. M. Cook received one vote. The counsel of the defendant then produced a certified copy of the return of the inspectors of election of the second election district of the town of Williamsburgh, in said county of Kings, duly certified by the county clerk of said county of Kings, from which it appeared that the whole number of votes given in said election district, at said general election, for state treasurer, was 694; of which number James M. Cook received 271 votes, and Benjamin Welch, jr. received 423 votes. It was then proved and shown, on the part of the defendant, by the testimony of James Hanford, Giles Smith and George F. Malia, that soon after sunrise, on the morning of the election in November last, John F. Runcie, town clerk of the town of Williamsburgh, administered the inspector's oath of office to James Hanford, James Murphy and Josiah Holmes, who had been appointed such inspectors, as appeared only from the evidence of William H. Butler, the plaintiffs' witness, and the appointment produced by him, hereinafter stated, received against the objection of the defendant's counsel; none of the elected inspectors being there present at the place of opening the polls. That thereupon said persons, as inspectors of election for said district, opened the polls of election in said district and proceeded to receive votes from the electors therein; that for nearly half an hour said Hanford acted as clerk of the polls, and kept a poll list with a lead pencil, because it was found to be impossible to procure any elector of the district to act as clerk; that finally, said

Malia consented to act as clerk, and was thereupon appointed by said inspectors, and entered on the discharge of his duties as such clerk, and commenced a poll list, and copied on to the same the votes from Hanford's list, he having recorded about forty votes while acting as such clerk. It did not appear that he was sworn to discharge the duties of clerk; as a witness, he testified that it was his own impression he was not. Soon after, Abraham R. Coles was persuaded to act as the other clerk, and was duly appointed and entered on the discharge of his duties as such clerk, and kept a regular poll list, having copied into it, from Malia's list, the votes received before he commenced acting as clerk. Giles Smith was an elected inspector, and John A. Burdett and —— Stevens were reputed to be two of the elected inspectors of election in and for said district; but neither of them were present when the polls were opened. Said Smith took his oath of office before a justice of the peace at the time he was elected, and was not sworn again. That said Smith came about 9 o'clock, A. M., and entered on his duties as inspector, and said Hanford left, and ceased acting as inspector. That at about 11 o'clock said Burdett came and entered upon the duties of inspector, and then Burdett, Smith, Murphy and Holmes, all acted a short time as inspectors; and then said Murphy ceased to act as inspector. That said Smith, Burdett and Holmes, held the election during the remainder of the day, said Malia and Cole acting as clerks; that for an hour before the polls were closed, said Murphy was in the room with the inspectors, and deposited some of the votes received in the proper ballot boxes; that Burdett, Smith, Murphy and Holmes, all acted as inspectors, at this time, for an hour; that said election was held in a large hall, the inspectors being in an adjoining room, and receiving the votes through a large window; that the polls were closed at sundown. The poll lists of the state box did not appear, from the evidence, to have been compared; in the city box they were, and they differed 25 or 30. That one Samuel B. Scott, being present, was then sworn in as an inspector of election; and said Hanford, Murphy, Holmes, Smith, Burdett and Scott, proceeded to canvass the votes. That

The People *v.* Cook.

all of said persons were engaged, for a time, in canvassing the city box. That before completing the canvass of said box, Burdett and Smith took the state box to another table, about three feet distant, Malia acting as clerk, and canvassed said box; Malia keeping a correct tally list of said canvass; that said canvass was completed, and the true result stated in said tally list, at about 8 o'clock, A. M., Wednesday, when said inspectors adjourned and went to breakfast; and at about 11 o'clock, A. M., met at the clerk's office, four or five blocks from the polls, and made a correct return of said votes and of said canvass from said tally lists; the return being signed by Burdett, Holmes, Hanford and Murphy, as inspectors; that said inspectors and clerks acted in good faith, and did not knowingly receive or record any illegal votes at said election, or reject any legal vote offered at said election; that all the votes received were deposited in the proper boxes, except that three state tickets were found in the city box, which were not canvassed, it not appearing that they were short of votes in the state box; that all the votes given at said election were honestly canvassed, and all the votes given for any candidate or person at said election were honestly and fairly allowed to said candidate or person in the canvass; and a true and faithful return of said votes and canvass was made by said inspectors; and that said election district contained about 900 legal and qualified voters; that said return was presented to the board of county canvassers for said county, but it was found to be defective, in not stating the whole number of votes given for several persons on the state ticket; and it was for that reason, by order of the board, given to Mr. Berry, one of the supervisors of Williamsburgh, to be taken to the inspectors to be corrected. That said Berry returned the same to the board the next morning, with the amended return attached thereto as a part thereof, and it was thus received by said board and canvassed. The original return was signed by the inspectors; and Mr. Stryker, the clerk, put their names to the paper containing the amendments, in pencil, after the same was delivered to said board of county canvassers. And the

same was not otherwise signed by the inspectors, and the said board acted on the said return as amended.

The defendant's counsel then proved that, at the same election, the inspectors of election, in the western district of the first ward of the city of Buffalo, took their oaths of office upon a book called "Watts' Psalms and Hymns," and not upon the Bible or the Gospels, believing, when they took such oaths, and until four o'clock, when the mistake was discovered, that they swore in on the Bible; that, with knowledge of the fact, said inspectors administered after four o'clock, P. M., to challenged voters upon said book, and not on the Gospels or the Bible, the oaths required to be put to such challenged voters, such voters not having desired to be sworn without the use of the Bible; that the number of voters so sworn was three; but that it was not known to said challenged voters that said book was not the Bible; that the two clerks of the polls of said election district took their official oaths in the same manner; not knowing, at the time, but they were sworn on the Bible, neither the inspectors nor the clerks asking to be sworn without the use of the Bible or Gospels; that Benjamin Welch, junior, had a majority of 185 votes in said election district, at said election, for the office of state treasurer; that the votes of that district were canvassed and allowed by the county canvassers of Erie county, and included in the official return and certificate, and returned to the state canvassers; that for the space of half an hour, at the opening of the polls, only one clerk acted; but one of the inspectors, in the mean time, acted as the other clerk, in keeping poll lists; that all the votes cast in that district, at said election, for state treasurer, were returned by the said inspectors, in their official return, to the county canvassers; that so far as the knowledge of the inspectors and clerks extended, there was no fraud or unfairness in conducting the election in said district; that no return of challenged voters was made.

It further appeared in evidence, that the returns of the county canvassers in the several counties of Greene, Essex, New-York, Tompkins, Chemung, Erie, Kings, Herkimer and Ontario, of the votes given at said election, did not state the number of votes

The People *v.* Cook.

given for each candidate for office in each of the several election districts and towns in said counties, but only the aggregate number given in said counties respectively for such candidates.

The defendant's counsel objected to the sufficiency of the returns from the second district of the fourteenth ward in the city of New-York, upon the grounds, 1st. That it appeared that there were but 405 persons who voted the state ticket in that district. 2. That no specimen ballot was attached to the return from that district. The defendant's counsel also objected to the returns from the county of Greene to the state canvassers, upon the ground, that it did not appear from the return what number of voters voted the specimen ballot attached to the return. Each of these objections was overruled by the judge, and the defendant's counsel excepted to the ruling upon each of the objections taken.

The people's counsel objected to the sufficiency of each of the returns of the county canvassers of the counties of Essex, Greene, New-York, Tompkins, Erie, Kings and Ontario, upon the ground that they did not respectively contain a statement of the whole number of votes given in each of their respective counties for state officers; and also upon the ground that they did not contain a statement of the whole number of votes given in each election district of each of said counties for state officers; each of which several objections was overruled by the judge, and the people's counsel excepted.

No evidence was offered by the defendant, on the trial, to prove that any person was either nominated or known to the electors at said election, for the office of treasurer, or any other office, by the name of Welch, or Benjamin Welch, or Benjamin C. Welch, junior, except the Mr. Welch nominated at the democratic convention held at Syracuse; but it was admitted that Benjamin Welch, the father of Benjamin Welch, junior, was at the time of said election living in the state of New-York, in the county of Chenango; that he was an obscure farmer, and was not, and never had been a candidate for the office of treasurer, or for any other office; that he was an old man, about seventy years of age, and that he never had held any public office.

The evidence being closed, the counsel for the defendant claimed that it should be submitted to the jury as a question of fact. 1st. Whether there was any fraud as to the manner of closing the polls, and in canvassing the votes in the second district of the fourteenth ward of the city of New-York. 2d. Whether the votes given for Benjamin C. Welch, junior, and Benjamin Welch, were intended to be given for Benjamin Welch, junior. All other questions were conceded to be questions of law and not of fact. The judge declined to submit either of these propositions to the jury; holding there was no evidence to sustain the allegation of fraud, and that inasmuch as the evidence adduced to establish the intention of the electors who voted the ballots having on them the name of Benjamin C. Welch, junior, and Benjamin Welch, without the addition of "junior," was all on one side, and not attempted to be explained or contradicted, and sufficient to establish *prima facie* the intention of those who voted them, to vote for Benjamin Welch, junior, the democratic nominee; no question of fact was therefore left to the jury. The defendant's counsel excepted to the above decision.

The whole case was then submitted to the judge without argument; and he decided the several questions arising in the case as follows: 1st. That the votes given in the third district of Catskill were improperly rejected, and should have been canvassed, and the majority of one hundred and six there given to Mr. Cook, awarded to him. 2d. That the votes given in the second election district of the town of Chesterfield, Essex county, were improperly rejected, and should have been canvassed, and the majority of twenty-five there given to Mr. Welch, awarded to him. 3d. That the ballots voted in Tompkins and Chemung county, one hundred and fifteen in all, were intended by the electors who voted them, for Benjamin Welch, junior; and that the ballots voted in Richmond, Ontario county, were also intended by the electors who voted them, for Benjamin Welch, junior, and should have been so canvassed and awarded to him. 4th. That the votes in Naples and Gorham, Ontario county, for Benjamin C. Welch, junior, were intended for Ben-

jamin Welch, junior, and were properly canvassed as such. 5th. That the votes in Herkimer, Buffalo and Williamsburgh were legally canvassed and allowed to Mr. Welch; and that the votes in the second district of the fourteenth ward of the city of New-York were improperly rejected, and should have been canvassed, and the majority given to Benjamin Welch, junior, allowed to him, and should now be allowed to him. The defendant's counsel excepted to the several decisions against the defendant, so made by the judge; and the jury rendered a general verdict for the plaintiffs under the direction of the court.

The defendant, upon a bill of exceptions, moved for a new trial.

*L. S. Chatfield*, (attorney general,) *and John A. Collier*, for the plaintiffs.

*B. Davis Noxon and Wm. L. Learned*, for the defendant.

MASON, P. J. It becomes important, in this case, to determine whether the objections, which are taken to the inspectors of elections in the several cases presented in this bill of exceptions, are of that character which should be held to invalidate the canvass in these several localities. These objections are of a two-fold character, extending to the regularity or legality of their appointment, and of their omission to qualify, by taking the proper oath of office. I will not stop to inquire whether these inspectors, in these several cases, were inspectors *de jure* or not. It is sufficient that they were inspectors *de facto*. They came into office by color of title, and that is sufficient to constitute them officers *de facto*. The rule is well settled, by a long series of adjudications, both in England and this country, that acts done by those who are officers *de facto*, are good and valid, as regards the public, and third persons who have an interest in their acts, and the rule has been applied to acts judicial, as well as ministerial, in their character. This doctrine has been held and applied to almost every conceivable case. It cannot be profitable to enter into any extended discussion of the cases. The principle has become elementary, and the cases are almost

endless in which the rule has been applied. As the four instances in which this principle becomes important, in the case under consideration, are somewhat dissimilar in their characteristics, I will proceed at once to a separate consideration of each, and content myself with simply referring to a few of the cases which, in their characteristics, bear a more striking analogy to that under consideration. We will proceed, in the first place, to consider the Chesterfield case. The board of county canvassers of the county of Essex rejected the returns of the inspectors of election in the second election district of the town of Chesterfield, which was regular in form, and which was signed by Seymour Ames, Jehial Beardsley and Major B. Weston, as inspectors of said election district. This return was given in evidence upon the trial of this cause, and the signatures of the inspectors thereto proved to be genuine. It was also proved that this was the only return from that district of the votes given at said election. It was also proved that these persons, who signed this return, officiated as inspectors in said election district all day, and that no question was raised by any one as to their right to act; and that no person claimed to be inspectors· that day, in said district, but them. It would seem, from the statement in the bill of exceptions, that Seymour Ames was generally reputed to be one of the inspectors in said district, and that he was sent for as such, and came, and proceeded to organize the board of inspectors. He appointed Beardsley and Weston inspectors, and the witness says that oaths were administered, and that they appointed clerks of the polls; but he cannot say positively that all were sworn. It was held in the case of *Greenleaf* v. *Low*, (4 *Denio*, 168,) that a person elected to the office of justice of the peace, but who has neglected to take the oath of office, and to give the security required by law, is nevertheless in office, by color of title, and his acts are valid as regards the public and third persons. To the same effect is the case of *Weeks* v. *Ellis*, where the justice had entered upon the duties of his office without taking the oath prescribed by law. (2 *Barb. S. C. Rep.* 320.) The same rule was applied to commissioners of highways who had omitted to take the oath of office, in the case of *The People*

The People *v.* Cook.

v. *Covert*, (1 *Hill*, 674;) and the same rule was applied to a constable, in the case of *The People* v. *Hopson*, (1 *Denio*, 575.) And in the *Matter of the election of Directors of the Mohawk and Hudson Railroad Co.*, (19 *Wend*. 135,) the doctrine was applied to inspectors of election; where it was expressly held, that, being officers *de facto*, their omission to take the oath prescribed by the statute did not invalidate the election. This disposes of the question of the oath, in regard to these inspectors, as well as the clerks of the board; and the only remaining question is, whether these inspectors are to be regarded as officers *de facto*, acting under color of legal authority. Lord Ellenborough said, in the case of *The King* v. *The Corporation of Bedford Level*, (6 *East*, 356, *citing Ld. Raym.* 660,) that an officer *de facto* is one who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law. It is a general rule, in relation to public officers, that they may establish their official character by proving that they are generally reputed to be, and have acted as such officers, without producing their commission, or other evidence of their appointment. (4 *John.* 366. 3 *Id.* 431. 6 *Binn. Rep.* 88. 9 *Mass. Rep.* 231. 7 *John.* 549. 9 *Id.* 125. 12 *Id.* 296. 5 *Wend.* 231. 9 *Id.* 17.) The plaintiffs proved that Seymour Ames was reputed to be an inspector of election district number two in the town of Chesterfield; and that he acted as such, is also proved. It was also *prima facie* proved, that there were no other inspectors present, when he proceeded to appoint Beardsley and Weston inspectors. Now if he was an inspector, lawfully entitled to act, and there were no other inspectors present, it became his duty, under the 3d section of title 8, of chapter 130, of the laws of 1842, to appoint two more inspectors to form a board, and this he did; and I think it is fair to presume, from the evidence in the case, that they took the constitutional oath; but we have already seen, this is not important, and their acts are valid without it. This doctrine, that the acts of an officer *de facto*, which concern the public, or the rights of third persons, are good and valid, has been applied to cases where the whole official duty of the officer, in its nature, consists in the performance of a single

act. (19 *Wend.* 141. 12 *Madd. Rep.* 467. *Plumer* v. *Brisco*, 11 *Ad. & Ellis,* 54; 63 *Eng. Com. Law Rep.* 53.)

The only remaining question, in regard to this second district in Chesterfield, is, whether the judge at the circuit erred in rejecting the certificate of C. D. Beaumont, town clerk, showing that Keith, Burt and Burbanks were declared duly elected inspectors in said second district; and that no others had been elected in their stead, and that no appointment of any others had been filed in his office, &c. This certificate was properly rejected. I find no warrant in the statute for his making any such certificate. The 9th section (1 *R. S.* 344) requires the statement of the result of the town election to be entered at length in the minutes of its proceedings by the town clerk; and the 24th section (*Id.* 343) requires the minutes of the town meeting to be subscribed by the clerk, and the officers presiding, and to be filed in the office of the town clerk, within two days after such meeting; and the 16th section (*Id.* 350) provides that copies of all papers, duly filed in the office of the town clerk, including those filed with him as clerk of the commissioners of common schools, and transcripts from the books of records, certified by him, shall be evidence in all courts, in like manner as if the originals were produced. (*Id.* 350, § 16.) There is no doubt that a certified copy of the minutes of the proceedings of the town meeting of 1851, on file in the town clerk's office, would be proper evidence to show who were elected inspectors of election in this second district; but the certificate offered does not comply with the requirements of the statute. But his certificate that none others were elected or appointed, is not evidence for any purpose. This is well settled. (*Oaks* v. *Hill,* 14 *Pick.* 442. *Wolfe* v. *Washburn,* 6 *Cowen,* 261, 265. 2 *Denio,* 15, 18.) It is not, therefore, necessary to consider whether the defendant could, legally, claim the right to prove that these officers were not, in fact, inspectors duly elected or appointed. There is, however, no principle better settled than that the acts of officers *de facto* are valid when they concern the public, or the rights of third persons, who have an interest in the thing done, and that their title to the office cannot be inquired into, collaterally, in this manner.

The People v. Cook.

(*The People* v. *Bartlett*, 6 *Wend.* 422. *Same* v. *White*, 24 *Id.* 520. *Same* v. *Covert*, 1 *Hill*, 674. *Same* v. *Stevens*, 5 *Id.* 616.) The supremacy of our laws could never be maintained, if individuals were allowed, in this collateral way, to question and try the authority of those who hold public office, and have control in making and administering the laws, under color of legal title. I am not certain, however, that this certificate of the town clerk, had it been drawn in conformity to the statute, would not have been admissible for the purpose of showing that Ames was not an inspector, acting under color of legal title; for I apprehend, while the law regards the acts of officers *de facto*, acting under color of legal title, valid as regards the public and third persons, it does not go the romantic length of giving sanction, in any case, to the acts of an officer where there is a plain usurpation of the office, without any show of legal title. The law holds the acts of the intruder void, both as regards the public and third persons. (*The People* v. *White*, 24 *Wend.* 520, 526.) The mere claim to be a public officer, and the performance of a single act, would not, probably, constitute an individual an officer *de facto*. There must be some color of an election or appointment, or such an exercise of the office, and an acquiescence on the part of the public, as would afford a reasonable presumption of at least a colorable election or appointment. (*Wilcox* v. *Smith*, 5 *Wend.* 234.) This certificate, however, did not purport to certify the record of the minutes on file in the town clerk's office; and as the negative part of the certificate was not evidence, the whole was, therefore, properly rejected. And I am of opinion that the evidence shows that, as well Ames as those he appointed, acted at least under color of legal authority, and are therefore to be regarded as officers *de facto*. (*Goshen* v. *Stonington*, 4 *Conn. Rep.* 209. *Young* v. *The Commonwealth*, 6 *Binn.* 88. 1 *Peters'* C. C. *Rep.* 429.)

We will proceed, in the next place, to consider the case of the election in the second district of the fourteenth ward of the city of New-York. The question, whether the canvass in this district shall be allowed, or not, may be considered under two principal heads: first, whether there were such irregularities,

in holding and conducting the election, and making the returns, as should be held to render the election invalid; and second, whether there is such evidence of fraud, in the case, as should require this question to be submitted to the jury. The determination of this first question will depend upon the construction to be put upon the statutes which the legislature have passed to guide the conduct of the inspectors, in conducting the election, and the canvass. If these statutes are to be regarded as merely directory, in the respects where they have been departed from, in this election district, then, of course, these departures from the directions of the statutes will not invalidate this canvass. If, on the contrary, a strict compliance with the statute is held to be imperative, to give validity to the canvass, then, most certainly, the votes cast in this election district cannot be allowed to the candidates. That some of these provisions of the statute are to be regarded as directory to these officers, and not conditions imposed, without which their acts would be held to be void, I think cannot be questioned; indeed we have already seen that one very important provision of this statute has been held to be merely directory, and that, too, the important one which requires the inspectors to take the constitutional oath, before they enter upon the duties of their office. Whether these other provisions of the statute, which have not been strictly observed in this case, are to be regarded as directory, or mandatory or not, must depend upon a sound construction of the nature and object of the requirements. There are, however, certain known and well settled rules to be observed, in the construction of these statutes, which have been settled by our courts, and which may be regarded as safer guides to courts than the individual private judgment of a judge. And one rule is, that statutes directing the mode of proceeding by public officers are directory, and are not to the regarded as essential to the validity of the proceedings themselves, unless it be so declared in the statute. (*Holland* v. *Osgood*, 8 *Vermont R.* 280. *Corliss* v. *Corliss, Id.* 290.) Within this principle, it has been held, that where a statute directs a public officer to do a thing within a certain time without any negative words restraining him from doing it

afterwards, the naming the time will be regarded as directory merely, and not as a limitation of his authority. Thus, in the case of *Pond* v. *Negus*, (3 *Mass. R.* 230,) where the assessors of a school district were directed by the statute to assess the district tax within thirty days after the district clerk had certified the vote for raising the tax, it was held to be merely directory, as there were no negative words in the statute limiting their power to make the assessments afterwards. And in the case of *The People* v. *Allen*, (6 *Wend.* 486,) where the militia law made it the duty of the commanding officer of the brigade to appoint a brigade court martial on or before the first day of June, in each year, it was held that the statute was merely directory; and as there was no negative upon his power to do it afterwards, contained in the statute, that his appointment, made at a later day, was valid. It was also held, in the case of *Marchant* v. *Langworthy*, (6 *Hill*, 646,) that the provision of the statute, requiring the clerk of the district to give notice of the annual meetings, was merely directory; and that the proceedings of the meeting were valid, although no notice was given. The general rule was laid down in the case *Ex parte Heath & Roome*, (3 *Hill*, 43,) that where a statute requires an official act to be done by a given day, for a public purpose, it shall be construed merely directory in regard to the time; and it was accordingly held, in that case, that where the statute required ward inspectors of the city of New-York to certify the result of the ward elections, on the day subsequent to the closing of the polls, or sooner, that their certificate was valid, although not made till the second day after the closing of the polls. It was again held, in the case of *The People* v. *Holley*, (12 *Wend.* 481,) where the statute directed that the. sheriff elect should execute his official bond within twenty days after he should receive notice of his election, that his omission to do so, within the time specified, did not subject him to a forfeiture of his office, as the statute was merely directory in regard to the time. It was held, in the case of *Jackson* v. *Young*, (5 *Cowen*, 269,) that the statute requiring the sheriff, upon the sale of real estate, to file his certificate of sale in the clerk's office, was merely directory,

and that his omission to file could not prejudice his proceedings. And so in the case of *Striker* v. *Kelly*, (7 *Hill*, 9,) where the act of 1830 directed the vote of the common council, upon a resolution opening streets in the city of New-York, to be taken by ayes and nays, it was held that the statute was directory merely. It was held, in the case of *The People* v. *Peck*, (11 *Wend*. 604,) that a certificate of the election of trustees may be received in evidence in a suit testing the validity of their election, although the statute directs the same to be made out immediately, and it be not made out till many months after. The court say, the statute is merely directory to the presiding officers to certify the result immediately; but should they refuse, or neglect to do so, the church is not to be without officers; the votes of the members cannot be thus rendered ineffectual. It was also held that the election was good, although the requirements of the statute, in respect to the notice of the election, had not been complied with, provided the election was fairly conducted, and the voters had information of the meeting. And so in the case of *The Mohawk and Hudson Railroad Company*, (19 *Wend*. 143,) before referred to, it was held that the statute requiring inspectors of corporate elections to take an oath is merely directory, and as there is no nullifying clause, on account of the omission, that the election is not invalidated by such omission to comply with the statute. The legislature, by the act of April 5th, 1842, have made the most ample provisions, as well to guard the public interests, as the rights of the electors. They have provided for the election of inspectors, by the 21st section of the act, and in case of failure to elect, or of absence, or removal, or other inability to attend, they have provided for their appointment by the supervisor, town clerk, or justices of the peace, and in the cities, the common council are to appoint; and by section one, of title four, they have made it their imperative duty to meet at the time and place appointed, to hold the election and organize a board. They are to appoint a chairman, who is required to administer the oath to the others, who are in return, or at least one of them, to administer the oath to him. They are directed to appoint two

clerks, to whom the chairman is directed also to administer the oath; the poll of the election is to be opened, in the several cities, at sunrise, and in the several towns, between sunrise and nine o'clock, A. M., and the poll is directed to be kept open till the setting of the sun, and no intermission or adjournment shall take place, until the poll be closed; and to guard against a possible failure of a board, they have provided by section three, of title eight, that if a majority of the inspectors shall not be present on any election day, the inspector attending shall fill the board by appointment on the spot; and they have, by the most extensive and comprehensive enactment, in title seven of the act, guarded both the ballot box and the franchise of the citizen; and one of those enactments subjects the inspectors of election to indictment, and both fine and imprisonment, for any willful neglect of duty, and for any corrupt conduct, in the execution of their duties. The legislature, in these enactments, undoubtedly intended to impose upon these officers, having the charge of conducting the election and canvassing the votes, a faithful observance of these provisions, as well to secure the public interests, as the rights of the electors; but I cannot think that they intended that an omission to comply in the particulars where they were departed from in this instance, whether the same occurred through the ignorance or inadvertence of the inspectors, should have the effect to deprive a whole district of their suffrage. This would be punishing the innocent for the sins of the guilty. If these directions of the statute were disregarded, through intentional neglect or the corrupt conduct of the inspectors, then it presents a case where public justice can be administered in the indictment and condign punishment of the inspectors, by fine and imprisonment. (*Laws of* 1842, *p.* 134, § 3. *The People* v. *Denton,* 2 *John. Cases,* 275.) And we have already seen, by reference to the adjudications, that statutes directing the mode of proceeding of public officers are regarded as directory, unless there is something in the statute itself which plainly shows a different intent. I think, both upon principle and authority, we must hold this election valid. This rule seems to have been very steadfastly adhered to by

our courts, in all cases where certain acts are directed to be done by public officers within a stated time and in a particular manner, when those acts are of a public character, and concern the public interest, or when the rights of third persons are concerned.

We have already seen that this rule has been very extensively applied, as well to officers of a judicial as of a ministerial character. The duties of inspectors of election partake somewhat of both characters. They have both judicial and ministerial duties to perform; and when we consider the character of those duties and the men who are necessarily selected to fill these offices, there is a greater seeming necessity of giving this rule a liberal application to them than almost any other class of public officers. These offices are generally filled by a class of men who are, to say the least, not instructed in the duties of their office by any previous course of study or preparation. They have, comparatively, no duties to perform except upon the election day; and the duties of their office end when they have completed the canvass. And besides, these duties are all necessarily performed in great haste and despatch, without much opportunity for deliberation; and amidst the excitement and bustle of surrounding hundreds of electors, all pressing them to a rapid despatch of their duties. It would seem, therefore, that if the most deliberate judgments of the highest civil magistrates in the land, affecting perhaps the dearest and most sacred rights of life, liberty and property, are to be held as valid, although that magistrate may never have taken the constitutional oath of office, there is even a greater seeming necessity of applying the rule to this class of public officers, and the same may be said of their duties generally. And when we take into consideration the fact that their acts concern political elections, where party politics enter into the canvass, and where the board of inspectors are composed of men of opposite political opinions, as they are now required to be, and where their duties are performed before the congregated electors, all eagerly watching the proceeding of the election, and any departure from a faithful performance of their duties; there does not seem to be so much danger of applying the rule to them as to many other public

The People *v.* Cook.

officers whose acts and conduct are public. But what are the particular irregularities complained of in this election district? First, and foremost, is the fact that the inspectors of election, as well as the clerks, were sworn upon Olendorf's new method of teaching French, a book probably as large as the New Testament, but not containing the gospels. This, we have already shown, cannot invalidate the canvass; for they can be no worse off by taking such an oath than they would have been had they taken no oath. Second, in proceeding for a short time with the election in the morning with only one clerk. There was a seeming necessity for this, and the omission cannot be allowed to invalidate this canvass; neither can the fact that the boy Henry sat by the table and kept a list of the voters, and copied some from the poll list kept by the other clerk; neither can the fact that, after Price and Gilmore went to their breakfast, O'Neill appointed McLaughlin an inspector, and administered to him the official oath, and that he and O'Neill then proceeded to act as inspectors for half an hour, while the others were gone to their breakfast; nor can the fact that McLaughlin assisted while the other inspectors were eating their dinners in the same room where the polls were held, and behind the same table upon which the ballot boxes were placed; nor the fact that he assisted, by the request of the others, for a short time while all three of them were present; and I do not think that the fact that the polls of the election was held open some ten or fifteen minutes after sundown, and some ten or fifteen votes were received after that time, should be held to invalidate this canvass. The statute is, that the poll shall be kept open till the setting of the sun. There is no negative upon their power to continue it after that time; and, as we have already seen, our courts have been very liberal in holding these statutes directory as to time, and as they only received the votes of those in the room at the time the sun went down, there was no abuse of a discretion, which I think the board possessed. They are required by law to hold open the poll till sunset. In this respect the statute would seem to be mandatory. This statute requiring the board to keep open the poll till sunset, was to secure the electors' right to vote, and not

to abridge it. It was to prohibit the board from closing the polls before that hour; and not as fixing the time of sunset as the period that should deprive the elector of his franchise, if he happened to stand before the poll of the election when the sun went down. The statute was intended to secure and protect the electors in their right of voting to this late hour of the day; and not to fix a limit beyond which the board of inspectors should not receive a single vote. And where they hold over a few minutes after, as in this case, I do not think it is such an irregularity as should invalidate the poll of the election; and I cannot think that the fact that at sundown the board agreed to receive the votes of those in the room, and directed the police officers to close the outer door of the room and prevent all others from coming in the room, and who accordingly did so, ought to be held to render this election invalid, and thus disfranchise this whole district. And I do not see any thing in the manner of canvassing the votes that should have this effect. As I understand the bill of exceptions, the state ticket was canvassed before the policemen excluded the spectators from the room; or, at least, before they left the room where the election was held; and it could not, therefore, invalidate the election that the certificate of the canvass was made in a private room, or that the same was not immediately made. (4 *Cowen*, 297, 323, 324, 325. 11 *Wend.* 611.) And there is no doubt that their amended return was valid, and was an official act which they were authorized to perform. The bill of exceptions contains the following statement in regard to the election in this district, to wit: that it was not shown or alledged on said trial that any illegal votes were received, or any legal votes were rejected at said election; but that it did appear on said trial, by the evidence of Price, O'Neill, O'Conner, and McLaughlin, who acted as inspectors at said election, that there was no intentional irregularity or wrong in any part of the proceedings, and that said votes were fairly and honestly received, and accurately canvassed and returned by said inspectors. I have carefully examined all the evidence in this case, in regard to the conducting the poll and canvassing the votes in this district; and

I have not been able to discover any evidence of fraud in relation to either; and I think, had the judge at the circuit allowed the defendant's counsel to go to the jury upon the question whether there was any fraud as to the manner of closing the polls and canvassing the votes in this district, and had the jury found in favor of the defendant on these questions, that we should be required to set aside their verdict as against evidence. The judge at the circuit was right, therefore, in refusing to submit this question to the jury.

We will proceed in the next place to consider the question whether the election in the second district in the town of Williamsburgh, in the county of Kings, is to be held invalid or not. Most of the legal questions in this case have been disposed of, in considering the case of the second district of the fourteenth ward in the city of New-York. I will only say, that I think the evidence in this case shows that the inspectors who opened the poll in the morning, acted under color of a legal appointment, and that they are to be regarded as officers *de facto*, acting under color of title, which is sufficient; and the fact that they were sworn by the town clerk is quite immaterial, for their acts are valid, though no oath were taken by them. There is no doubt, also, that the elected inspectors, who came in afterwards and took their places, are to be regarded as officers *de facto*, if not *de jure*, acting under color of legal election. I am inclined to think that the judge at the circuit was right in allowing the certificate of appointment of Murphy, Holmes and Hanford inspectors of said district. This paper was proved by the present clerk, Butler, to be in the handwriting of his predecessor in office; and that the same was taken by him, Butler, from the files of the town clerk's office and brought to court to be used upon the trial; and that this paper was signed by Berry and Sparkman, supervisors, and by Powell, a justice of the peace of said town, and by Runcie, the town clerk, and that the indorsement upon the back was in Runcie's handwriting. The 22d section of title three of the act of April 5th, 1842, requires these officers to file such certificate of appointment in the town clerk's office. This certificate was the best evidence,

and was sufficiently proved; and whether the same was filed on the 4th day of November, or after, was wholly immaterial, as the statute is silent as to the time of filing. (11 *Wend.* 611. 4 *Cowen,* 297.) But if the statute had directed it on the day it was made, it would be regarded as merely directory, and their omission to do so would not affect the appointment, as is abundantly shown by the cases to which we have referred in a former part of this opinion. It is not important, therefore, to inquire whether the book, which was allowed in evidence by the judge at the circuit, to show that this appointment was filed on the 4th day November, was properly received or not, as the evidence was wholly immaterial, and must ever be, under any conceivable view of the case, and could not affect the verdict. The fact that the board proceeded a while without clerks, one of the inspectors acting as such, cannot affect the canvass. They procured clerks as soon as they were able to do so; and I cannot think that it would invalidate the election had the inspectors themselves kept the poll list, when they had made suitable endeavors to procure clerks and failed. They are the officers designated by the statute to hold the election, and a part of their duty is to appoint clerks of the polls, and their omission to do so ought not to invalidate the election, when all else is fair and honest. The fact that a part of the time there were four inspectors acting at the poll, and that the returns were signed by four, cannot affect the election. This was undoubtedly an irregularity, but cannot invalidate the election. (7 *Wend.* 264. 1 *John.* 500.) I do not discover any thing in the manner of conducting this election or the canvass that should be held to invalidate the election; and as it appears to have been fairly and honestly conducted, and as no complaint was made upon the trial, in this respect, and the true result of the ballot was ascertained, with reasonable certainty, I think the votes of this district should be allowed to the candidates. And I cannot but entertain the opinion, that the returns made were valid, and were properly allowed by the canvassers. But if the returns are not good, we are then required to go behind them, and ascertain the true canvass. The election, and not the return, is the foundation of the right; and it has

been repeatedly held, in this court, that in a suit of this character, the court and jury are to look beyond the returns, and indeed beyond the ballot boxes, if necessary to ascertain the truth. (*The People v. Ferguson*, 8 *Cowen*, 102. *The People v. Vail*, 20 *Wend.* 12. *The People v. Seaman*, 5 *Denio*, 409.)

The propositions which we have maintained, in regard to the elections in these districts, dispose of all the questions raised, except in the western district of the first ward of the city of Buffalo, where the inspectors of the election were sworn upon "Watts' Psalms and Hymns," and not upon the gospels. I ought to say, perhaps, there is one question presented in this case, which we have not considered in these other cases, and that is, there were three challenged voters who were sworn upon the same book, and as this question is also presented in one of the former cases, I will hereafter dispose of them together.

I will not spend any time in considering the objection raised to the ballot used in the county of Herkimer, for I have not been able, after the most deliberate consideration of the objection raised, to perceive that there is any thing in it. The ballots were all right as to the state officers, and contained no more names of persons than there were persons to be chosen at said election. There was, however, at the bottom of the ballot, "For county judge, Ezra Graves;" and this, it is claimed, renders the ballot void. I take it to be wholly immaterial how many names a ballot contains, if it does not contain more names for the same office than there are officers to be elected at the election. The ballot for every officer on a ticket containing more than one office, must be regarded as a separate ballot. I think the votes in these three towns were properly canvassed, and must be allowed.

The next question which I propose to consider in this case, is whether the judge at the circuit was right, in refusing to submit to the jury, as a question of fact, whether the votes given for Benjamin C. Welch, jr., and Benjamin Welch, were intended to be given for Benjamin Welch, jr. The addition of junior to a name is mere matter of description, and forms no part of the name. It is, generally, to distinguish between a father and son who reside at the same place. (*Fleet v. Young*, 11 *Wend.*

524. *Blake* v. *Tucker*, 12 *Verm. Rep.* 45. *Kincaid* v. *Howe*, 10 *Mass. Rep.* 203. *Leprot* v. *Brown*, 1 *Salk.* 7. *Cobb* v. *Lucas*, 15 *Pick.* 9. *Padgett* v. *Lawrence*, 10 *Paige*, 177.) The chancellor said, in the case of *Padgett* v. *Lawrence*, " The word junior forms no part of the name, but is merely descriptive of the person, and is usually adopted to designate the son, when the father bears the same christian name, as well as family name. Where the word junior is left out, it is only presumptive evidence that the oldest person of the name, and who will answer the other matters of description in the deed, was the grantee intended ; and the presumption may be rebutted, by showing that the grantor intended to convey to the son." The court say, in the case of *Cobb* v. *Lucas*, (15 *Pick.* 9,) " The addition of *second* would as clearly distinguish one from an older person of the same name, as junior." They add : " Neither of the terms constitutes any part of the name, but they are used to describe and designate the person, as his residence is sometimes used for the same purpose."

The court say, in the case of *Fleet* v. *Young*, (11 *Wend.* 524,) that " the addition of senior to a name is mere matter of description, and forms no part of the name." They say further, " the omission thereof furnishes no ground of variance, where . there is any addition or description, by which the real party intended can be ascertained." The court say, in the case of *Blake* v. *Tucker*, (12 *Verm. Rep.* 45,) " that the mere fact that at one time the addition younger is affixed to a name, and not at another time, raises no reasonable doubt of its designating the same person, especially when the persons do not, at both times, reside in the same town." The court say, in the case of *Leprot* v. *Brown*, (1 *Salk.* 7,) " If a father and son are both called A. B., by naming A. B., the father, *prima facie*, shall be intended." But they add : " If a devise were to A. B., and the devisor did not know the father, it would go to the son. The addition of junior to the name is only used as merely descriptive of the person, and as it is an appendage which is assumed by the person, and discarded at will, it does not constitute very strong evidence of that." The court say, in the case of *Fleet* v. *Young*, (11 *Wend.* 524,) that " the person who makes this ap-

The People *v.* Cook.

plication, was Samuel Young, the younger, at the commencement of this suit before the justice, five years since; but for aught that appears in this case, he may have been Samuel Young the elder, in October last, when this writ of error was sued out." The court say again, in the case of *Blake* v. *Tucker*, (12 *Verm. Rep.* 45,) in speaking upon the subject: "We are then left to the common presumption whether these names intend the same person, which is in favor of the identity in this case, because 'younger' is no part of the name, and he is engaged in acquiring title to land at one time, and at another not very remote in conveying away the same land.'

We must, therefore, look at the evidence in this case, to ascertain whether there was sufficient doubt left in this case upon the question, whether these votes were intended for the candidate Benjamin Welch, jr., to require this question to be submitted to the jury. There is no conflict in the evidence upon this branch of the case. The facts upon which the question is to be determined, may therefore be said to be undisputed. But as they are somewhat different in each county, we will proceed to consider the cases separately. And first, as to the votes in the county of Chemung. The undisputable facts in regard to the ballots in this county are these. The return of the county canvassers shows, that there were 68 votes given for Benjamin Welch; that in the first election district of the town of Chemung, in said county, 16 of said votes were given, and in the town of Cayuta, in said county, 52 of said votes were given. It appears also that Benjamin Welch, jr. was the democratic nominee for state treasurer, both in the years 1849 and 1851, nominated at the Syracuse convention in each of those years, and supported at the polls, by his political partizans, for that office; that there was no other candidate nominated or supported by the democratic party, for that office, in 1849 or 1851. It also appears that the ballots for the towns of Chemung and Cayuta, in the year 1851, were printed by Julius Taylor; that by inadvertence or mistake some of the ballots had the name of Benjamin Welch, the junior being left off; that four tickets were printed on one sheet of paper, and this omission occurred in every fourth ticket;

that there were 600 of these tickets worked off and sent out be-
fore the mistake was discovered; that the printer employed to
print the ticket intended to print it correctly, with all the names
of the nominees of the Syracuse convention. Two of these were
presented and identified by Taylor, as printed by him, with the
junior off; that Taylor knew Welch, the nominee for this office,
personally, and intended to print the ballots correctly. It ap-
pears that Lyman Ramsdell got from Taylor's printing office
200 ballots; that he voted one of them before it was discovered
the junior was off from any of the ballots; that it was near 12
o'clock of the day of election before the mistake was discovered,
and then the balance of the tickets were all corrected by writing
in the junior. It appears that Ramsdell folded all the tickets
which he received for his district. It appears that Ramsdell
supported Welch, the nominee of the convention; and that when
he folded the ballots he did not know whether the nominee's
name was Benjamin Welch or Benjamin Welch, jr., but he sup-
posed the ballots were all right, and took them on trust. It
appears that these tickets which had the junior left off, had the
name of Van Etten on for assembly, and in all other respects it
contained the regular democratic ticket, Van Etten's name being
printed in the place of Wynkoop, who was the regular demo-
cratic nominee for assembly in Chemung. It also appears that
those who peddled tickets of this kind received them from Rams-
dell, and distributed them to the voters as the regular democratic
ticket except the name of Van Etten, and that they intended to
support Welch for treasurer, as well as all the nominees of the
Syracuse convention; and that as soon as the mistake was dis-
covered, and about the middle of the day, the remaining ballots
were all corrected. It does not appear that the electors in this
district ever heard of, or knew, any other Benjamin Welch than
the nominee of the Syracuse convention, and those who distrib-
uted these tickets, and were active in procuring them to be voted,
all swear that they never heard of any other Benjamin Welch;
and the same thing is testified to by all the electors sworn from
this town. They say, at the same time, that they knew Benja-
min Welch as a resident of Erie county, and as a former candi-

The People v. Cook.

date for the same office; and it appears, also, that in the town of Chemung, he has as often been called Benjamin Welch, as Benjamin Welch, jr., and some of the witnesses say more so. Now if the case stopped here, I apprehend that no one could hesitate, for a moment, to say that these votes were intended to be given for Benjamin Welch, jr., the nominee of the Syracuse convention. This conclusion is irresistible, from these undisputed facts in the case; and what does the defendant offer, to overthrow this very plain and clear case of intent? There is no evidence offered by the defendant on the trial. to show that any person was either nominated or known to the electors in this town, at said election, except the nominee of the Syracuse convention. The only answer found in the bill of exceptions is the admission of the plaintiffs, found at fol. 236 of the bill, where it is admitted that Benjamin Welch, the father of Benjamin Welch, jr. who is an obscure farmer, and was not, and never had been, a candidate for the office of state treasurer, or for any other office, and who was an old man, about 70 years of age, and had never held any public office, was, at the time of said election, living in the county of Chenango, in this state. I do not see how this weakens the case in the least, for I think it is fairly inferable, from the evidence, that he was wholly unknown to the electors in this district. They had never known or heard of such a man; much less is the presumption to be indulged, upon this evidence, that they intended to vote for him for state treasurer. I think, upon this evidence, the judge at the circuit was right in refusing to send this case to the jury upon this question. The court may, when the case is clear for either party upon the evidence, dispose of the case. If the evidence, in the opinion of the court, will not authorize the jury to find a verdict for the plaintiff, they may nonsuit the plaintiff; and if they would set aside a verdict, upon the evidence if so found, it is their duty to nonsuit. (*Stewart* v. *Simpson*, 1 *Wend.* 376. *Demyer* v. *Sawyer*, 6 *Id.* 436. *Wilson* v. *Williams*, 14 *Id.* 146. *Dodd* v. *Davis*, 3 *Hill*, 287.) And so, where the evidence is uncontradicted, and not sufficient to warrant a verdict for the defendant, the judge may, on such evidence, direct a verdict for the

plaintiff, instead of submitting the question of the sufficiency of the evidence to the jury; and a new trial will not be granted, when he assumes to do so, if a verdict for the defendant would be against the clear weight of the evidence. (*Nichols* v. *Goldsmith*, 7 *Wend.* 160. *Rudd* v. *Davis*, 3 *Hill*, 288.) This rule applies, with peculiar force, to a case like the present, and is one where the exercise of this power, by the court, is eminently proper. There is no dispute about the facts in this case. The only question is as to the legal effect of the evidence; and taking the facts all together, in their most favorable light, they would not have warranted a verdict for the defendant upon this branch of the case. The case is substantially the same, in regard to the 52 votes given for Benjamin Welch in the town of Cayuta, in the county of Chemung; only I think the case is made a little stronger in behalf of the plaintiff, by the calling of more witnesses from that town, and for the reasons stated in regard to the case of the second district in the town of Chemung. I think the judge ruled correctly in regard to these votes in Cayuta.

We will proceed to consider, in the next place, whether the forty-seven votes, given in the county of Tompkins, for Benjamin Welch, were intended for the candidate, Benjamin Welch, jr. The undisputed facts in regard to this case, as they appear in the bill of exceptions, are these: these forty-seven votes, given in this county, for Benjamin Welch, were all given in the town of Lansing, in said county. In election district No. 1, forty of them were given, and in district No. 2, seven. It appears that one Henry March, who was the whig nominee for superintendent of the poor, in the county of Tompkins, procured to be printed, at the Ithaca Journal office, some 300 to 400 ballots, with his name in the place of Mr. Seaborn, the democratic nominee for that office, and that he directed the whole democratic state ticket to be printed upon the ballot, with the exception above stated, and that the printer, through inadvertence, left off the junior to the name of Benjamin Welch for state treasurer. March received these tickets, believing them to be the true and regular democratic tickets, with the exception of his own name, and distributed them in both election districts in

The People *v.* Cook.

said town as such. It seems that March procured these tickets to be printed at the suggestion, and to accommodate certain of his democratic neighbors and friends, who were willing to vote for him, and distributed them amongst his democratic friends, as the true democratic ticket, his name excepted. It appears, also, that all the ballots in this town, which had the name of junior off, had also the name of March for superintendent upon them; that these ballots were placed in the hands of democrats, who swear that they intended to support and vote for all the democratic nominees, except in the case of March, and that they distributed these tickets as such, and voted them, believing them to be such; that they intended to support, by their suffrages, Benjamin Welch, jr., the nominee of the Syracuse convention; and some of them, who discovered that the junior was off, say, that they were advised and believed that it would make no difference with the ballot, and, as well those who peddled these tickets, as all others that were sworn who voted them, unite in saying, that such was their intent to support Mr. Welch, and that they supposed it would make no difference whether the junior was off or not. And all unite in saying, that they heard of no other candidate of that name at the election, and neither knew nor had they heard of any other man of that name. And all the evidence in the case, to rebut the presumption that these votes were intended to be given for Benjamin Welch, jr., the nominee of the Syracuse convention, is the admitted fact that Benjamin Welch, the father of Benjamin Welch, jr., a man of about seventy years of age, an obscure farmer, who was not a candidate, and never had been, for the office of treasurer, and who had never held any public office, or been a candidate for any, was, at the time of said election, living in the county of Chenango, in this state. I think the evidence of the intention, in regard to these votes, is quite as strong, if not stronger, than in either of the other cases; and for the reasons stated, in regard to the first considered of those cases, I think the judge at the circuit was fully justified in holding as he did in regard to these votes. These facts were all uncontroverted and undisputed, and the intent of the voters is too apparent to even submit the question to a jury.

The case in Ontario county is somewhat different from either of the others. It appears from the statement of the official canvass in that county, that the whole number of votes given for state treasurer was 6591, of which 3664 were for James M. Cook, 2827 for Benjamin Welch, jr., and 32 for Benjamin C. Welch, jr. It also appears, by the return of the inspectors of the electon in the town of Richmond, in said county, that the whole number of votes for state treasurer in that town was 276, of which 119 were for James M. Cook, 109 for Benjamin Welch, jr., and 32 for Benjamin C. Welch, jr., and that these 32 are the same votes stated in the county canvass, and also in the state canvass, for Benjamin C. Welch, jr., and not allowed to the candidate Benjamin Welch, jr. It also appears, from the testimony of Jacob J. Madison, that he printed the greater part of the democratic ballot, used in said county, at said election; that he printed six tickets upon one sheet, and that one ticket in every six had the letter C. in; that the compositor put the letter C. in all the ballots, and that he read the proof sheet, and marked out the C., and the compositor corrected all but one. It also appears that Joseph Garlinghouse got from said Madison one package of said ballots, and Dr. Simmons got another package, both of which were taken to the polls of the said town of Richmond, and there distributed by them. It also appears that said Madison furnished similar tickets to the towns of Naples and Gorham, in said county. It is also proved by said Madison that Benjamin Welch, jr., was the democratic candidate for state treasurer, and had been nominated by the democratic state conventions in 1849 and 1851; that said Madison edited a democratic paper, and knew of no other democratic candidate for state treasurer than Benjamin Welch, jr.; that at the time of the election he had never known, or heard of any other man by the name of Benjamin Welch, or Benjamin C. Welch, except Benjamin Welch, jr., of Buffalo; that said Benjamin Welch, jr., was known to be the regular democratic candidate for treasurer at said election. It was also proved by Joseph Garlinghouse, Oscar F. Pierpont, Perry M. Bently, and Dexter R. Hawks, that they were present at the

polls in the said town of Richmond at said election; that they knew Benjamin Welch, jr., to be an editor of a paper in Buffalo, and the democratic candidate for state treasurer; that they knew of no other man by the name of Benjamin Welch, Benjamin Welch, jr., or Benjamin C. Welch, jr., nor had they heard of any other; that no man by the name of Welch, except the candidate Benjamin Welch, jr., was a candidate, or named as such, at that election, to their knowledge; that the ballots printed at Madison's office were folded by one of the witnesses, and distributed and voted at said election as the regular democratic state ticket; and that the C., in the name of Welch, in the printed sheet, was not noticed till 4 o'clock P. M. on said election day. The only evidence offered or given by the defendant, bearing in any manner upon this branch of the case, is the admission contained in the bill of exceptions, before referred to, that Benjamin Welch, the father of Benjamin Welch, jr., was living in the county of Chenango, in this state. It has been repeatedly held, in this court, that the middle letter between the christian and surname does not prejudice, even in judicial proceedings and in conveyances of estates. It is no part of the name, for the law knows only of one christian name. (*Franklin* v. *Talmadge,* 5 *John.* 84. *Roosevelt* v. *Gardinier,* 2 *Cowen,* 463. *Milk* v. *Christie and Todd,* 1 *Hill,* 102. *Bratton* v. *Seymour,* 4 *Watts'* R. 329.) Judge Cowen, speaking upon this subject, in the case of *Milk* v. *Christie and Todd,* says: "The middle letter was no part of the name, and was therefore properly rejected as surplusage, both in the pleadings and evidence." The court say, in the case in 4 *Watts,* "An initial letter interposed between the christian and surname is no part of either." They add: "It is evidently no part of the surname, for it is supposed to be the exponent of an appellation received in baptism; and it is no part of the christian name, for no person can have more than one christian name." They say further, the initial letter expresses no word, and consequently nothing that can pass for a name, or a part of a name. (4 *Watts' Rep.* 329.) To the same effect is *Rex* v. *Newman,* (1 *Lord Raymond,* 562.) The letter C. being no part of the name, it seems to me that

these votes, given in the town of Richmond, should be allowed to the candidate Benjamin Welch, jr. If, however, we go behind the returns, as we are required to do in this case, and consider the question as it stands reflected in the evidence, there can be no doubt but that these votes were intended for the candidate Benjamin Welch, jr. The whole evidence in this case, in regard to these votes, all concurs to identify him as the man for whom they were intended, and nothing could be more unjust and subversive of the fundamental principles of our government, than to deprive this candidate of his election, upon such evidence as this. The evidence upon which this question is to be determined, is all undisputed. There is not a single disputed fact for a jury to find in regard to this branch of the case. It becomes, therefore, wholly a matter of inference, or legal intent, to be drawn from undisputed facts. And in this case there cannot be, upon this evidence, any danger of mistaking the voice of the electors ; and I entertain no doubt that the judge at the circuit was right, in ruling as he did, in his refusal to submit this branch of the case to the jury. There is a question raised upon the returns from the towns of Naples and Gorham, in this county, and which has undoubtedly originated from the same cause, and is all attributable to the same mistake of the printer of these ballots. The returns from these towns state that, in the 2d election district, 62 votes were given for Benjamin Welch, jr., and the same number for James M. Cook, for state treasurer, and which votes were canvassed and allowed to them respectively by the county canvassers and by the state canvassers, and that the specimen ballot attached to said return, headed " State," had thereon for state treasurer the name of Benjamin C. Welch, jr., and there was also written, partly on said ballot, and partly on the paper to which it was attached, words indicating that 60 ballots of that kind were received, and no ballot attached to said return having thereon the name of Benjamin Welch, jr. And the same question, upon precisely the same state of facts, except the difference in the number of votes, is presented by the returns from the town of Naples. The judge at the circuit decided that the votes in Naples and Gorham, On-

tario county, for Benjamin C. Welch, jr., were intended for Benjamin Welch, jr., and were properly canvassed as such, to which the defendant excepted. I am inclined to think that the judge at the circuit decided correctly, in allowing this canvass to stand, in these towns, upon the evidence in the case. The inspectors had decided that these votes were intended for Benjamin Welch, jr., and so had allowed them, and so did the county and state canvassers. The duty of the inspectors, as well as the county and state canvassers, partakes of a two fold character; as some of their duties are judicial, and some ministerial. In determining whether certain ballots are intended for a given candidate, or not, they act in a judicial capacity; while, in certifying a return of the cavass, their act is purely ministerial. I think, therefore, that it devolves upon the defendant to impeach this determination by some legitimate evidence; or else it must be allowed to stand as they have determined it. And besides, the middle letter " C." is not regarded as any part of the name, and the insertion of it is satisfactorily accounted for by the printer. There is nothing in the objection taken by the defendant's counsel to the sufficiency of the returns from the second district of the fourteenth ward in the city of New-York, at fol. 230 of the bill. The returns show that there were but 398 votes given in that district for state treasurer; and there is nothing therefore in the first objection. And the omission of the inspectors to attach a specimen ballot to their return cannot affect the case, for two reasons: First, the omission is not an insuperable objection to the return; (*The People* v. *Seymour*, 5 *Denio*, 412;) and besides, the evidence in the case goes behind the certificate, and shows the true state of the ballot at the polls, which is clearly admissible, and which must control. (*The People* v. *Vail*, 20 *Wend*. 14 *and* 15. 20 *Pick*. 490, 491, 492.) There is an objection taken in regard to the election in the second district of the fourteenth ward in the city of New-York, and also in the western district of the first ward in the city of Buffalo, which we have omitted to notice; and as they are precisely the same in principle, we will consider them together.

It appears that two challenged voters were sworn in the second

district of the fourteenth ward, upon Olendorf's French Grammar, and in the western district of the first ward of the city of Buffalo, three challenged voters were sworn upon Watts' Psalms and Hymns. The common law doctrine is, that an oath taken in any form to which the affiant assents, and by which he intends to be bound, is, if administered by a competent tribunal, a valid oath. (*Whart. Am. C. Law*, 185. 16 *Pick*. 156. *Roscoe's Crim. Ev.* 130, ed. 1846. 6 *Carrington & Payne*, 571. *Cowen & Hill's Notes*, 705, n. 494.) It is said, however, that our statute (2 *R. S.* 407, § 82) has prescribed the form of administering the oath; and that it requires all persons to be sworn, by laying their hands upon and kissing the gospels, unless the witness expresses a different desire. It was held, however, in the case of *The State* v. *Whittenhurst*, (2 *Hawk*. 458,) that any form pointed out by the witness is binding, and he may be indicted for perjury upon it; and they add, so he may, though he omit to make known his scruples of conscience, and be sworn in the common law form, or any other binding form. They add, by submitting to be sworn in the common form, he makes his election, and is estopped to set up his scruples. (*Cowen & Hill's Notes*, 705.) It is also said in the case of *The Rex* v. *Brodribb*, (6 *C. & P.* 571,) that if the oath administered was intended to be administered as binding, and was so received by the party, it is equally within the statute against perjury, whether the book on which he was sworn was a testament or not. It would seem, therefore, to say the least, that it is very doubtful whether perjury could not be assigned upon these oaths. If so, they must be considered valid. If it should be held that our statute, in regard to oaths, had not abrogated the common law rule, there can be no doubt but that these oaths must be held valid. It is not necessary to place the case, however, upon this ground; for it would be absurd to hold, that the receiving of 5 illegal votes, in these two districts, is to disfranchise both districts, and render the elections therein invalid. The most that can be claimed on the well settled law of the case is, that these 5 votes should be rejected, and that cannot affect the result. (3 *Hill*, 42. 7 *Cowen*, 153. 5 *Denio*, 409.) There is, I be-

The People *v.* Cook.

lieve, but one other objection to this case to be considered. It seems that the poll lists in Williamsburgh disagreed some 30 votes, and the inspectors drew out enough to reduce the ballot to the lowest poll list. This was an irregularity, but cannot invalidate the election; and these 30 votes, if all allowed to the defendant, cannot change the result, and this is the most that can be claimed by him. I believe that we have gone through with the entire case, and considered substantially all the questions presented by the bill of exceptions. There are many of these questions which, in the theory of our government, are of vast importance; and which present considerations of intrinsic difficulty. I cannot but think, however, that to hold that the omissions of these officers, through negligence, mistake or other inadvertence to comply with all these directions of the statute, should have the effect to disfranchise the electors, would be unjust in the extreme, and indeed subversive of the fundamental principles of our government. I think that the only sensible rule upon this subject is not to permit such omissions, whether they are the result of negligence, ignorance, mistake or fraud, to invalidate the election, whenever, by going behind the returns, the canvass, or even the ballot boxes, the true state of the canvass or ballot can be obtained, and the expressed will of the electors ascertained; and the cases in this court have already gone this length. (4 *Cowen,* 297. 8 *Id.* 102. 20 *Wend.* 14. 3 *Hill,* 42. 5 *Denio,* 409. 20 *Pick.* 484.) In the case under consideration, the investigation has been carried behind both the returns and the ballot box, and I think it has been shown, very satisfactorily, and beyond any reasonable doubt, that if the clearly expressed will of the electors is to control in the matter, the defendant is not entitled *de jure* to hold the office he now possesses; and it is equally clear that Benjamin Welch, jr., is by the clearly expressed will of the electors, as declared through the ballot boxes, entitled to the office.

GRAY, J. The first question I propose to consider is upon the ruling at the circuit, refusing to submit to the jury, as a question of fact, whether the ballots voted at the last general election

for Benjamin C. Welch, jr., and those for Benjamin Welch, without the addition of jr., were intended by those who voted them for Benjamin Welch, jr.

All the ballots for Benjamin C. Welch, jr. were voted by the electors of the towns of Richmond, Gorham and Naples, in the county of Ontario; and all those for Benjamin Welch, without the addition of jr., were voted by the electors of the towns of Chemung and Cayuta, in Chemung county, and in the town of Lansing, Tompkins county. To establish that these ballots were voted by persons who intended to vote for Benjamin Welch, jr., it was shown that he resided in Buffalo, and was generally known to the electors of these towns·as the candidate nominated by the state convention of his party, held at Syracuse in the fall of 1851, for the office of state treasurer. That the ballots printed for circulation in the towns of Richmond, Gorham and Naples, were printed upon sheets, each having upon it six ballots. In each of these ballots the compositor placed the letter " C." in the name of Welch, as the initial of a middle name ; and when the proof was read, the letter " C." was marked out, but by mistake was omitted to be taken out of one-sixth of the ballots in each sheet. These ballots, thus mistakenly printed, were folded, circulated and voted by several of the electors of Richmond, who upon the stand testified that they intended to vote for Benjamin Welch, jr., the candidate of the Syracuse convention ; that no other man by the name of Welch was known to or heard of by them, as a candidate for the office of state treasurer, than Mr. Welch of Buffalo, the nominee of that convention. The ballots of this description voted in Naples and Gorham, were understood by the inspectors of election in each of those towns to be intended for Benjamin Welch, jr., and were therefore counted and allowed to him in the canvass of the votes in each of those towns. Those in Richmond, 32 in all, were allowed to Benjamin C. Welch, jr., and not to Benjamin Welch, jr.

In the county of Chemung, a portion of the party who supported the nominees of the Syracuse convention, were dissatisfied with their party candidate for the assembly, and, with a view to defeat his election, procured tickets to be printed, sub-

The People v. Cook.

stituting the name of the opposing, instead of that of the candidate of their own party for that office. These tickets were all procured, printed and circulated by persons who intended to support Benjamin Welch, jr. for the office of state treasurer; but, by mistake at the printing office, the addition of jr. was omitted in one-fourth of the tickets thus procured and circulated in the towns of Cayuta and Chemung. In Tompkins county, the whig candidate for the office of superintendent of the poor procured democratic tickets to be printed, except the substitution of his own name instead of the name of the democratic nominee for that office. In printing these tickets the addition of jr. to the name of Welch was also by mistake omitted. The tickets, thus mistakenly printed, were circulated in the town of Lansing, where 47 of them were voted. It was shown by several of the electors in each of these towns of Cayuta, Chemung and Lansing, who voted the ticket shown to have been erroneously printed by mistake, that they intended to support Benjamin Welch, jr., the nominee of the Syracuse convention; some testifying that he was as well known by the name of Benjamin Welch, as Benjamin Welch, jr.; and others, that they supposed the addition of jr. made no difference in the ballot; all concurring in the statement, that they did not know and had not heard of any other man by the name of Welch, as a candidate for state treasurer, than the nominee of the Syracuse convention. As a further evidence that the several persons who voted the ballots in which the C. was inserted, as well as those upon which the jr. was omitted, were of the party who nominated Mr. Welch, and intended to vote for him, it was shown by the election returns from each of these towns, that if these ballots were counted for him, his vote in each town, in which they were circulated and voted, would be equal to his associates upon the state ticket, and no more.

There was no evidence that any other Benjamin Welch than Benjamin Welch, jr. of Buffalo existed, except his father, an old man about 70 years of age, a farmer residing in Chenango county, but slightly known, who was not at the last election, and never had been, a candidate for or held any public office; nor

was there any evidence of the existence of a man called Benjamin C. Welch, jr. If proper interrogatories had been submitted to the jury with a view to a special verdict, they must, and doubtless, would have found, 1st. That Benjamin Welch, jr. was nominated, at a state convention held at Syracuse in the fall of 1851, for the office of state treasurer. 2d. That no person by the name of Welch, other than the nominee of that convention, was known to or heard of by the electors of either of those towns as a candidate for that office. 3d. That the ballots having upon them the name of Benjamin C. Welch, jr., and those having upon them the name of Benjamin Welch, without the addition of jr., were thus printed by mistake of persons who intended to print them for Benjamin Welch, jr. 4th. That the positive evidence of all those called to the stand, who voted those tickets, established their intention to vote for Benjamin Welch, jr.; and that all those who voted them, including those not called as witnesses, were of the party who nominated him. Nothing then remained to be found, except that all those who voted the residue of the tickets erroneously printed, intended, like those called to the stand, to vote for Benjamin Welch, jr.; and this they must have found, (had it been submitted to them,) as an inevitable result, from the previous facts. A verdict otherwise would have been against an unbroken current of evidence, and without a fact to sustain it. The presumption is that the electors intended to vote for some man by the name of Welch, either known to or heard of by them, and not for a fictitious or imaginary name. The evidence was clearly sufficient to establish, *prima facie*, that no other man by the name of Welch, except Benjamin Welch, jr. of Buffalo, was a candidate for the office of state treasurer; and without evidence to rebut it, a verdict of the jury that these votes were not intended by the persons who gave them for Benjamin Welch jr., could not have been upheld. I see no reason, therefore, to doubt the correctness of the ruling at circuit.

The remaining questions are as to the official character of the persons acting as inspectors of election; the formation of the board; the manner of voting, the validity of challenged votes; and of the manner of closing the polls and canvassing the votes.

The People *v.* Cook.

The first of these questions, in their legal order, arises out of the defendant's objection to the validity of the election in the second election district of the then town of Williamsburgh; which is, that the persons who opened the polls, appointed clerks and received the votes in the early part of the day, were not even *de facto* inspectors of election. When the time arrived for opening the polls, none of the regularly elected inspectors of election for that district appeared. Their absence warranted the appointment of others in their stead. (*Laws of* 1842, *p.* 38, § 22.) A paper was produced, bearing date November 4th, 1851, signed by the supervisors, a justice of the peace and the town clerk of Williamsburgh, appointing the persons, who opened the polls, inspectors of election for the 2d election district of that town. The signatures and official characters of those who signed it were proved. The book of the town clerk of that town was produced by the person having its legal custody, and proved. From this it appeared, in the handwriting of the then town clerk of that town, in the chronological order of filing papers, that an appointment of inspectors of election for the 2d district of that town was filed November 4th, 1851. It also appeared that the appointment produced was indorsed in the handwriting of the town clerk, filed November 4th, 1851. This appointment, to have been a valid, legal appointment, as against others claiming the office, should have been signed by more than one justice, in conjunction with the other officers who signed it. The statute confers the power to appoint inspectors, when the chosen ones shall be absent, upon the supervisor, town clerk and justices of the peace, and not upon a single justice with the other officers named. There was no evidence that more than one justice of the peace attended. On the argument we were referred to the case *Ex parte Willcocks et al.* (7 *Cowen*, 402,) as an authority establishing that an appointment made by a less number of persons than are authorized is inoperative. That was a direct proceeding to vacate an election under a power conferred by the legislature, the result of which was to restore all persons concerned in it to their original rights. It was like a power to affirm or reverse judgments depending upon questions whether

errors had occurred in the courts below. The question, whether the persons whose election was set aside were officers *de facto*, was raised in that case by counsel, but was not considered by the court, for the obvious reason that the legality of their official acts affecting the public or third persons was not involved. The mere irregular exercise of a conceded appointing power does not afford the only cases of colorable appointments, rendering the persons appointed officers *de facio*. In the case of *Fowler* v. *Beebe*, (9 *Mass. Rep.* 231,) it was held that an appointment by the governor, of a sheriff, at a time when he had not power, for the reason that the county in which the sheriff was to officiate did not exist, was a colorable appointmant, constituting the person appointed sheriff *de facto*, although the appointment was void, as was afterwards held in the case of the *Commonwealth* v. *Fowler*, (10 *Mass. Rep.* 290.) Thus it will be seen that it is not merely voidable appointments that are, out of regard to the interests of the public and third persons, held to be colorable, but those that are absolutely void. This appointment had the semblance of authority, and that was sufficient, until questioned by a direct proceeding on the part of those having a valid title to the office it purported to confer.

The bill of exceptions states that the polls were opened by the persons named in this appointment, who had been appointed inspectors of election as appeared *only* by the evidence of Butler, who proved the signatures to the appointment, the indorsement upon it, and produced the book of the town clerk, and proved the entries in it. This is a clear mistake in settling the bill, apparent from the other facts stated in it. The appointment, with the filing indorsed upon it, does not of itself show that it was made in the morning of the day, but connect with the testimony of the witness, Butler, the fact that the persons appointed acted in the morning of the day, and the presumption arising from what is natural and usual, (1 *Cowen & Hill's Notes*, 244, 245,) justifies the conclusion that (the appointment and official acts being on the same day) the appointment preceded the acts. (*Sheldon* v. *Wright*, 7 *Barb.* 45.) But without proof of this or any other appointment, there is abundant evidence in the

case to establish them officers *de facto.* Such officers are defined by Lord Ellenborough, C. J., to be such as have " the reputation of being the officers they assume to be, and yet are not good officers in point of law." (*Rex* v. *The Corporation of Bedford Level,* 6 *East,* 356.) In *Wilcox* v. *Smith,* (5 *Wend.* 234,) Sutherland, J., doubtingly expressed the opinion that a single or even a number of official acts were not sufficient to constitute an individual an officer *de facto.* I say doubtingly expressed the opinion, because he said they would not *perhaps* constitute him such officer. Whether they would or not, was not a question in that case. The only question was whether one, acting as a justice of the peace for three years, was *prima facie* proved to be the officer he assumed to be, and hence the remark of the learned judge was *obiter,* and has not the weight of authority. Reputation of official character alone, without acts, has been sufficient. (*Potter* v. *Luther,* 3 *John.* 431.) I do not find that the authority of this case has ever been arraigned or doubted. Acts alone have also been held sufficient. Best, J., in *Snow* v. *Peacock,* (2 *Carr. & Payne,* 215,) said, " I think proof that a man acts as a magistrate is proof of his being so in, any. case." A single official act, by trustees of a church, before the act in question, has been held sufficient evidence of official character to warrant the jury in finding the persons acting to be the officers they assume to be. (*The Queen* v. *Murphy and Douglass,* 8 *C. & P.* 297.) Proof that a man acted as president of a court martial has alone been held sufficient evidence that he was at the time president of that court. (*The State* v. *Gregory,* 2 *Murph.* 69.) In *Reed* v. *Gilbert,* (12 *John.* 269,) a justice's judgment was sued upon, and the justice who rendered the judgment was produced as a witness upon the stand, and by him the original record of the judgment was proved : nothing more, not even that other judgments had been rendered by him, or that he had ever in any other case acted as a justice of the peace, was proved. Upon objection that no evidence had been produced that he was a justice, it was held not to be necessary, in an action founded upon the judgment, to show that the person before whom it was obtained was a magistrate. Thus it will be seen that either

reputation or acts are sufficient evidence of official character. That the evidence of reputation or acts may be disputed is not doubted, but when they are established the acts of the person to whom they give official character cannot be impeached collater-- ally. This rule is founded upon public convenience, and estab- lished to protect the rights of the public and third persons, who have acted in good faith. The principle decided in the case last cited, as to the amount of evidence necessary to establish official character, goes very far, if not the entire length of making each official act of the persons who opened the polls, publicly per-- formed and acquiesced in at the time, evidence of itself *prima facie* sufficient to prove them to be the officers they assumed to be.

The rights of third persons and the public, who have an inter- est in them, are saved in the shape in which official acts have placed them, because they have acted in good faith, believing, from what appearances indicated, that the persons exercising the office had the right to do so; but if either public reputation or antecedent official acts are necessary to establish the official character of the persons who opened the polls, so as to protect the rights of those who confided to them their suffrages, the former is abundantly established by the facts in this case. The duties of many public officers are transacted with but a single individual or few persons at a time. In all such cases some time must necessarily elapse, and different official transactions transpire, before evidence can be afforded of public knowledge in the neighborhood by whom the office is exercised, or of public acquiescence in the right of the incumbent to discharge its duties. In the case before us the business of opening the polls and preparing to receive votes, and receiving them, was neces- sarily of the most public character. Their business was with and concerned the public, by whom they were then surrounded : divided in sentiment politically, some one or more of them would doubtless have questioned their official character, if doubt had existed in relation to their right to act. Their position and that of the public acquiescing in it by depositing with them their ballots affords at once more satisfactory evidence of public

repute of their official character, than could be furnished in relation to many other officers acting, as occasion might require, for months. It matters not that two of these inspectors subsequently yielded their place to two of those regularly elected. Why they did so is not shown, nor is it material that it should be. The inspectors *de jure* had the right to officiate in preference to the inspectors *de facto*, who were at perfect liberty to yield their place without a conflict; and the reasons that controlled them could not affect the rights of those who had before that time deposited their votes in good faith.

The next question arises upon the return from the inspectors of the second election district of Chesterfield, Essex county. This return was improperly rejected by the board of canvassers of that county. Ames was reputed to be an inspector before he acted. The absence of any other inspector gave him the power, exercised by him, of appointing two other electors of that district to act with him as inspectors of election for that district. None other than Ames and his associates appointed by him claimed to be inspectors. No one questioned their right to act. The title of Ames having been established by *prima facie* evidence, necessarily made the appointment of his associates valid, and thus afforded all the requisite evidence of the regularity of the election in that district. The proof offered, to show that other persons were elected inspectors of election for that district, was properly rejected, for two reasons : 1st. No competent evidence of the fact was offered. A town clerk is not made a judge of the fact which a paper on file, or an abstract from the books of record in his office, would establish. His certificate is evidence that papers or abstracts from books of record are true copies of the originals, and nothing more, (1 *R. S.* 350, § 16 ;) and from the copies the court are to determine what they prove. His certificate, stating simply who were elected inspectors, was unauthorized and properly rejected. 2d. The right of the acting inspectors to discharge the duties of the office, was established by *prima facie* evidence of their title to the office constituting them at least inspectors, (*Rex* v. *The Corporation of Bedford*

*Level,* 6 *East,* 356 *to* 361;) and being such, their title could not be questioned in this suit. (*Greenleaf* v. *Low,* 4 *Denio,* 170.)

The next questions arise out of the failure of inspectors of election in the second district of Williamsburgh, the second district of the fourteenth ward in the city of New-York, and the western district of the first ward in the city of Buffalo, to comply with the provisions of the statute in relation to the formation of the board of inspectors, and the appointment of clerks. The inspectors of the second district of Williamsburgh were sworn by the town clerk of that town. Those in the second district, fourteenth ward, New-York, and one clerk, and those in the western district, first ward, Buffalo, and both clerks, were each sworn upon a book which they at the time believed to be a Bible, but which was afterward discovered not to be. In Williamsburgh, several votes were taken before either of the clerks were appointed, one of the inspectors acting as clerk. In the 2d district, 14th ward, New-York, but one clerk was appointed until after several votes were taken ; and in the western district, 1st ward, Buffalo, but one clerk acted, until half an hour after the polls were opened, one of the inspectors in the mean time keeping the poll lists. The reason for not sooner appointing the requisite clerks in New-York and Williamsburgh, was owing to the difficulty of sooner procuring the services of competent persons who would consent to act. It is now objected that the town clerk of Williamsburgh was not authorized to administer the inspector's oath, and that the manner of administering it to the several inspectors and clerks in the other districts not being in conformity to law, vitiated the election in each of those districts. In answer to this objection, so far as it related to the several oaths administered upon a book mistaken for the Bible, it was insisted, upon authorities cited, that the oaths thus administered were binding upon those who took them. Whether they were or not, cannot be material, so far as relates to the acts of those by whom they were taken. The act prescribing the manner of forming the board had nothing to do with the creation of inspectors as such. They existed independent of it. Its simple object was to regulate their conduct in the formation of

The People v. Cook.

themselves into a board for the business purposes of their office, and is therefore plainly directory. It contained no prohibitory provision against proceeding otherwise than in accordance with those directions, and hence worked no forfeiture of the rights of third persons. (*The People* v. *Allen*, 6 *Wend.* 486. *Ex parte Heath*, 3 *Hill*, 42. *In the matter of the Mohawk and Hudson Railroad Co.*, 19 *Wend.* 143. *Greenleaf* v. *Low*, 4 *Denio*, 168.) Even though the statute had, upon their failure to take the oath prescribed, declared their office vacant, and authorized others to be appointed in their stead, it could not prejudice third persons or the public, whose rights were involved by their official action. (*The People* v. *Collins*, 7 *John.* 549. *M. and H. Railroad Co.*, 19 *Wend.* 142. *Greenleaf* v. *Low*, 4 *Denio*, 168. *Weeks* v. *Ellis*, 2 *Barb. S. C. Rep.* 320.) This rule extends to all officers, as well those who may be styled political officers, as others. (*Backman* v. *Ruggles*, 15 *Mass. Rep.* 182.) It would be impracticable to require each citizen to investigate and judge at his peril who are and who are not in strictness of law officers, or whether they have complied with the directions of the statute regulating their conduct; especially on the day of election, when the time afforded is not a tithe of what is necessary for investigation and redress. It is sufficient that they have a colorable appointment or election, or the credit of being the officers they assume to be. A similar objection was raised to the validity of the election, arising out of the omission to appoint clerks before opening the polls. This omission, as may be seen by the authorities already cited, could not make the public sufferers "for the faults to which they were in no way privy," or work a forfeiture of a single vote cast, unless on account of the omission the result could not be ascertained with reasonable certainty. One of the appointed inspectors for Williamsburgh, after vacating his seat to one of those regularly elected, returned to the polls on two occasions and acted for a short time as inspector, the other being then present and acting at the same time. The inspectors, in the ordinary business of receiving and depositing votes, exercise no judicial power or discretion to be affected by the presence of one more than the number constitut-

ing a board. There was nevertheless manifest error as well on the part of the fourth inspector, in acting after he had vacated his seat, as on the part of the three persons acting in permitting him to do so. But unless some mischief has grown out of it, innocent persons ought not to suffer. There can be no pretense that in this case an illegal vote was received, or a legal one rejected or omitted to be placed in the proper box on account of his presence.

The next objections in their proper order arise out of the manner of voting, and of swearing challenged voters. It is objected that the ballots in several of the election districts in Herkimer county were not in conformity with the statute, and hence ought not to have been counted. The error complained of, as appears from the specimen ballot attached to the returns, consists in this, that at the bottom of the ballots deposited in the state box, having upon them the name of Benjamin Welch, jr., for state treasurer, with the other candidates for state officers, properly indorsed " state," there was a ballot for county judge, having upon it the name of a person for that office. The right to vote is conferred by the constitution, without any restriction as to the manner of voting, except that it shall be by ballot. (*Const. art.* 2, § 5.) The only power expressly given to the legislature to regulate this right, is to be found in the duty imposed upon them, to make laws for ascertaining, by proper proofs, the citizens entitled to it, and to direct whether town officers shall be chosen otherwise than by ballot. (*Art.* 2, §§ 4, 5.) No power whatever is given to abridge this right, or exclude any person, upon whom it has been conferred, from its enjoyment, unless he has been convicted of some infamous crime, or has become interested in a wager, depending upon the result of the election at which he offers to vote it. (*Ib.* § 2.) No officer or board having been designated by the constitution to receive and canvass the votes of citizens, upon whom the right to vote is conferred, legislation was necessary to provide for the election or appointment of such a board, and nothing more was required, or even authorized. Especially if it had the effect to embarrass electors in the enjoyment of that right. The object of the stat-

The People *v.* Cook.

ute, in regulating the "manner of voting," was to prescribe directions to be observed by each voter in making his ballot, so as not to lose it by omitting to make the necessary designations upon it, that the board might determine the office to which he intends to elect each person voted for by him, or by placing more names upon it, designated for any office, than there were persons to be chosen to fill it. Without the statute, this care by each person was necessary, to enable the board to determine which of the number of persons voted for by him he preferred for the office. (*The People v. Loomis,* 8 *Wend.* 396, 399.) The further object was to secure the secret exercise of his suffrage, and to promote convenience and accuracy in the canvass ; and hence the manner prescribed for folding and indorsing the ballots so as to guard against the curiosity of the board to ascertain its contents, and secure its being placed in the proper box, with a view to dispatch and accuracy in the canvass. These several provisions were intended to benefit, and not prejudice the elector, and were so far complied with as to free from doubt the design of each elector, and not prevent the inspectors from arriving at the true result. A breach of them worked no forfeiture of the ballot. (1 *Kent,* 165.)

. Objections were made to the validity of the election in the 2d district of the 14th ward, New-York, and in the western district of the 1st ward of Buffalo, on account of the manner of swearing challenged voters. Five challenged voters in all were sworn upon a book not containing the gospels. Each voter took the oath, believing, at the time, he was swearing upon the Bible. Without considering the question whether the voter challenged, and thus sworn, could be deprived of his suffrage by the mistake or design of the inspectors, or whether the oath was valid and binding upon the person taking it, it is enough to say of this objection, that if it be conceded to be well taken, these votes, added to the ten or fifteen taken in the city of New-York, after the outer doors of the poll rooms were closed, if excluded, would not affect the result. (*Ex parte Heath,* 3 *Wend.* 42. *Ex parte Murphy and others,* 7 *Cowen,* 153.)

The next questions are upon the exceptions of the defendants to

the ruling at the circuit, refusing to submit to the jury, as a question of fact, whether there was any fraud as to the manner of closing the polls and canvassing the votes in the 2d election district of the 14th ward in the city of New-York, and to the ruling upon the validity of the canvass in the 2d district of Williamsburgh. The facts claimed to afford evidence of fraud as to the manner of closing the polls in the New-York district are, that when it was discovered to be sunset, the inspectors agreed to close the outer doors of a large room, in which the election was held, and keep all persons out, and receive the votes of those in the room, ready to vote, and then close the polls. This was done. Those in the room, ready to vote, voted : some 10 or 15 in all. The polls were then closed. Between sundown and the time of closing the polls, a fourth person, who had been appointed inspector, in the absence of two of the elected inspectors, and upon their return had vacated his place, was present and acted as inspector with the other three. There was no evidence that any person outside desired to vote, or that the number or character of the votes were affected by closing the outer door. It is not, however, necessary to discuss the question, whether there was any evidence that would justify the inference of a fraudulent design, as to the manner of closing the polls, inasmuch as the only effect such a design could have, would be to exclude the 10 or 15 votes received after the outer doors were closed. Exclude those votes, and the only effect of it is to diminish the majority, and not change the result. The question proposed to be submitted, so far as it related to the manner of closing the polls, was therefore immaterial. (*Ex parte Heath,* 3 *Wend.* 42. *Ex parte Murphy and others,* 7 *Cowen,* 153.) The only fact relied upon to establish fraud, as to the manner of canvassing the votes, was that they were not canvassed publicly, the police officers attending upon the board, only, being present. There was no error in the canvass, so far as it related to the state box, except the omission to attach a specimen ballot to the return, to which to impute a wrong motive. The positive evidence of the inspectors, of both political parties, concurred in proving the accuracy of all that was done, and put at rest any

The People *v.* Cook.

suspicion of a fraudulent design by the inspectors, and left no controversy to be settled by the jury. In Williamsburgh, the same inspector who vacated his place on the arrival of one of the elected inspectors, and for a short time on two other occasions acted as inspector, was present and assisted in the canvass. A fifth person had the inspector's oath administered to him, and also assisted in the canvass. Neither of these persons assisted in canvassing the state box. That box was canvassed by two of the regularly elected inspectors at a separate table, one of the clerks keeping an accurate tally list. The poll lists of the state box were not compared. Those of the city box were, and differed 25 or 30. It was shown that in that district there were about two hundred more legal voters than there were ballots in the state box. After the canvass was completed and the result stated, the inspectors adjourned, and returned in about three hours to the clerk's office, four or five blocks from the place where the polls were held, where the returns were made and signed by all the persons acting as inspectors at the canvass, except the fifth person, to whom the inspector's oath was administered after the polls were closed. It was shown that all the votes given were fairly canvassed and allowed to each candidate for the office designated upon the ballot, and that a true return was made. These irregularities, as well as others before referred to, which occurred in this district, arising out of the failure of the inspectors to observe the directions of the statute regulating the manner of conducting elections, were not only severally, but collectively insisted upon, as vitiating the election. The question arising upon them, in either aspect in which they were presented, comes to this, whether an election should be held invalid, for irregularities in not observing the law regulating elections, unless there has been carelessness or corruption on the part of the officers or those interfering, which prevents arriving, with reasonable certainty, at the true result. No one will doubt the importance of a rigid adherence to all the provisions of the statute regulating elections ; nor will any one doubt that it is more important to ascertain the true result of the votes cast. To vote is a right secured by a paramount law, and

lies at the foundation of our government; while the statute was intended simply to regulate the conduct of those who receive, canvass, and make returns of the votes, for the benefit of those upon whom the right to vote has been conferred, unrestricted as to form, except that it shall be by ballot. If a strict adherence to the directions of the statute are indispensable to the validity of an election, and they are not complied with, the penalty falls upon the voter, notwithstanding the exact result has been ascertained, and that, too, through the medium of officers who, so far as the public and third persons are concerned, had the right to receive the votes. This, in effect, would make the regulation more important than the right—the statute and not the constitution the paramount law—and would result, so far as concerns the election at which the statute directions have not been obeyed, either through the ignorance, carelessness or design of the officers of elections, in a virtual disfranchisement of those upon whom the right to vote has been conferred, except in those cases where power is conferred to vacate an election, and restore electors to their original rights. We have no such power. The result of an election, when controverted in court, is like a judgment sued upon. We have no power to reverse it for errors in conducting it, and thus give those concerned in it a re-trial; but upon the evidence elicited, we must determine what judgment has been rendered, and hold it valid or void; and if the result can be ascertained, the mere errors of elective officers, which have not affected it, ought not to invalidate it. These questions have oftener occupied the attention of congress than of courts. The decisions of that body, it is true, have not been uniform, and are not entitled to the weight of authority. A reference, however, to such as have been in principle sustained by the opinions of judges of our courts, may be referred to with propriety. In 1793, Van Rensselaer contested the seat of Van Allen upon several grounds. Among others it was stated, in his petition, that the ballot box was not locked, agreeably to law, but was tied with a tape, and that Van Allen, who was an inspector of election in one of the towns, in the district he claimed to represent, had in his possession, during the election, the ballot box. The in-

vestigation upon the petition was concluded, by the adoption of a resolution, that the allegations of the petitioner did not state corruption, nor irregularities of sufficient magnitude, under the laws of New-York, to invalidate the election. (*Con. El. in Congress*, 73, 77.) In 1830, a contest arose out of an election in Tennessee, where, by the statute, each ticket was required to be put in a box, to be locked up or otherwise well secured; the place made in the box for the reception of tickets, to be sealed at the close of the polls, when the inspectors were to take charge of it, and keep it until the next day, when the seal was to be removed. Upon an investigation, upon the petition of Arnold, contesting the seat of Lea, it appeared that in one portion of the district out of which the contest arose, a gourd, instead of a box, was used for the reception of tickets, which, at the close of the polls, was tied up in a handkerchief. In another portion of the district the inspectors of election were not sworn, and in another the ballot box was not kept over night by an inspector, but by a blind man, who locked it in a desk and kept it there over night. The committee to whom the petition was referred were of opinion, that the omission by the inspectors to be sworn, did not vitiate the election; and that, notwithstanding the irregularities in conducting the election, it had been conducted fairly and honestly; and that the seat of Lea ought not, therefore, to be vacated. A resolution to that effect was adopted by the house. (*Con. El. in Cong.* 601, 2, 4, 5.) The principle adopted in each of these cases is sustained by one clearly implied in that of Bronson, J., in the case of *The People* v. *Vail*, (20 *Wend.* 14,) where he repels the idea that the will of the electors, plainly expressed in the forms prescribed by law, can be defeated by the negligence, mistake or fraud of the officers appointed to register the result of an election. And in the case of Strong, petitioner, (20 *Pick.* 491, 492,) Morton, J., says: "It would be more in consonance with the spirit of our institutions, to inflict severe punishment upon the misconduct, intentional or accidental, of the officers, but to receive the votes, whenever they can be ascertained with reasonable certainty." Upon principle, therefore, fortified by the

opinions of experienced and learned judges of courts of justice, a departure, by the inspectors of election or clerks of the polls, from the statute directing the manner of conducting elections, whether it be attributable to ignorance, negligence or fraudulent design, cannot deprive the electors of their right secured by a paramount law, unless one or more of the causes has rendered it impossible to ascertain the result with reasonable certainty. The ballots in the state box, in this district, were canvassed without the interference of those who had no right to mingle in it; and although the directions of the statute were not, in all respects, complied with, there is no evidence to warrant the conclusion, that there were more ballots in that box than were legally voted and placed there, or but that the true result of the vote was ascertained and stated. I am therefore of opinion, for the reasons stated, that a new trial ought to be denied.

CRIPPEN, J. and SHANKLAND, J. concurred.

New trial denied.

[CORTLAND GENERAL TERM, September 14, 1852. *Mason, Crippen, Shankland* and *Gray*, Justices.]