*508 On the Merits.
Ludeling-, C. J.,
Seven persons, who were candidates on the same ticket for different offices, to wit: Nicholas Burton for sheriff, M. Dubose for parish judge, and David King, C. E. Shearer, Jackson Snelling, Henry Price, and John Halloway for police jury, instituted this suit against the persons who were candidates for said offices on the other ticket at the election in Carroll parish in November last.
They allege that the election was null and void, “because of the various irregularities and illegalities in the appointment of commissioners to hold the election in the manner of holding it, and frauds committed by the commissioners at the various polling precincts, and the acts of other persons, interested in the election, in viola'ion of the statutes of this State and of the United States, known as the enforcement act, as follows,” to wit:
“That the commissioners were not selected from the different political.parties, nor were they of good standing; that said commissioners did not take the oath prescribed by law, nor did they examine the ballot boxes before commencing to receive votes; that the election in ward. No. 1 was not held at the proper place; that the election in said ward was held in a small room away from the public view of the voters; and a large number of the ballots or votes cast in said ward were not placed in the box in view of the voters, nor taken.from their hands by the commissioner receiving the ballots; that the commissioner, Jackson, who received the ballots, was seen to change several ballots placed in his hands, and deposit in the box tickets other than those handed him by the voters ; that Cain Sartain, a candidate, cast several different ballots at said election at said precinct; that the tally sheets of the votes cast at said election wore not closed and signed by six o’clock the day following the election ; that the same were changed after six o’clock on said day and made different irom what they were first made up alter the election ; that neither the tally sheets nor ballot box containing the ballots cast at said precinct have been deposited in the office of the clerk ot the district court, although Daniel Jackson, one of the commissioners, is himself clerk of said court.”
They further charge irregularities and fraud at the other precincts of the parish, and pray that the election be declared null and void. And they further pray that should the court decide that the election held at wards four and five, was valid, notwithstanding the irregularities and frauds complained of, and that the election was null and void at all the other precincts; that in that event, they be declared elected to the various offices for which they were candidates.
*509 The defendants severally filed exceptions, stating that there was an improper joinder of plaintiffs and defendants; that several different plaintiffs were claiming different things from different defendants, in the same suit. Moss further pleaded that the court was without jurisdiction rations maleriw to entertain the suit as to his office, that of parish judge; and the candidates for police jury severally pleaded to the jurisdiction of the court, because the emoluments of the office did not exceed five hundred dollars.
These exceptions were overruled. On the trial, the defendants severally claimed the right to challenge ten jurors under the act of 1855. This was denied them, and they took a bill of exceptions to the ruling. If id was ever contemplated that several plaintiffs claiming different offices could unite to bring one suit against several defendants, it is manifest from the unambiguous language of the law in regard to contested elections, that each defendant would have the right, which was claimed and refused in the district court. Section 1429 of the Revised Statutes, treating of the trial of contested election cases, declares that, “in empanneling the jury each party shall be entitled to ten peremptory challenges.”
Another bill of exceptions was taken to the ruling of the judge a quo refusing to permit the defendants to prove by parol what the actual votes were which were cast at every precinct for each candidate. The circumstances under which the defendants offered the parol proof were as follows. After the trial had commenced, a rule was taken on the clerk of the court to produce the ballot boxes and tally sheets, which section 13 of the act of 1873 directs shall be delivered to the clerk. The clerk answered that they were not in his possession, but in the possession of R. R. Anderson, his deputy.
A rule was then taken against Anderson, but the coroner’s returns show that he could not be found in the parish, and that he had gone to New Orleans. Thereupon the plaintiffs applied for a continuance. In their application for a continuance they swore that they expected to prove by the production of said ballot boxes that the ballots and returns had been so tampered with that no election can be declared in said parish They subsequently made another affidavit, in which they state that they expect to prove “by the ballot boxes and returns * * were not made out and sworn to as the law requires ; and they will not show the same result as the ballots in the boxes.”
To avoid a continuance, the defendants admitted that “ the returns made out for the last election in this parish were not made out and sworn to as the law requires, and the ballots in the boxes for ward No. 1 will not show the same result as the returns.”
It seems to us that if the statements in the affidavits be true that *510 the ballots and. returns in the ballot boxes called for have been.tampered with so as to render them unreliable as evidence, the result of the election as ascertained and announced by the commissioners of election at each precinct might have been proved by the next best evidence in existence.
The defendants are not charged with the irregularities or frauds complained of in conducting the election ; nor are they charged with having said boxes, nor with tampering with them. Under the circumstances, there are no presumptions against the defendants, and they had the same right that plaintiffs had to introduce the best evidence, which the nature of the case admitted of. But we do not perceive that the refusal of the judge injured the defendants, as the onus of proving that the election was null and void, or that they were elected, was upou the plaintiffs, and they have introduced no evidence to establish fraud, illegality or irregularity at the election, except as to ward No. 1 and ward No. 2, besides the admissions of defendants made as above stated. But they do not allege or attempt to prove that if the entire vote of wards two and one were thrown out they would be elected. They only claim that this result would be attained if all the wards in the parish, except wards Nos. 4 and 5, were rejected; thereby admitting that they were not elected.
As already stated, the only evidence offered by the plaintiff was the admissions aforesaid, and the testimony of witnesses as to what occurred in relation to the election at wards Nos. 1 and 2.
The only witness offered by plaintiff who testified in regard to ward No. 2 is E. P. Montgomery. He-says: “I was at the voting precinct of ward No. 2 of this parish on the second of November last; the tally list was closed and signed Tuesday night following the election, between eight and ten o’clock ; I was a commissioner of election at said precinct. All the tally sheets and ballots were locked up in the box after counting of the votes. The tally sheets were not signed that night. I did not sign the tally sheets at all.” On cross-examination he said, “ the reason I did not sign the tally sheets that night was because the commissioners did not think the law compelled them to do so; it was not on account of any unfairness or irregularity in the election at said polling precinct at the time of closing the polls that I did not sign them ; the tally list was correct at the time it was made out; we completed the list some time Tuesday night following the election between ten and eleven o’clock; I won’t be positive about the time, but it was after dark ; the election, the counting of the ballots, and the making out of the tally lists at said precinct was fair while I was present; there were no frauds or irregularities in the voting or counting of votes and making out of tally sheets at said precinct so *511 far as I know; if there had been any, I would have been apt to have known it, for I watched very closely.”
When recalled, he stated : “ The commissioners did not, while I was with them, make out a list of all the persons voted for, the offices for which they were voted for, the number of votes received by each, and sign and swear to the same; I never did sign such a list; I don’t know that the box containing the ballots and tally lists was deposited with the clerk of the district court; we counted the votes an'd made a record of what each man received, and put down the names of each candidate and the offices for which they were voted, and the number of votes each man received; there were three such tally lists as above described made out by the commissioners; on closing the polls each commissioner swore to the number of votes polled; they did not swear to the returns above described in my presence.”
It is manifest that no court could hold that the election at that precinct was illegal, null and void.
In regard to what occurred at ward No. 1, the facts, as disclosed by the evidence, appear to be that the commissioners of election opened the polls at the door of a small house ; that a rail, which was placed across the door to keep the voters irom pressing against the table, upon which the ballot box stood, was broken by the pressure of the crowd, and the commissioners found it necessary to receive the ballots at a window of the same house. This window was between five and a half and seven feet high. Rhodes, a witness, swears the exact height to be five feet nine inches. That when the voter stood at the window he could not see the ballot box; but he could see the commissioners, and the box was in full view of those who stood a short distance from the window. It appears the officers of election and some of the candidates on both sides, were inside the house, near the ballot box. It further appears that those who desired to handed their ballots with their registration papers to the commissioner, who received them, and that the Dallots were deposited in the ballot box. It appears further that a large number of persons voted by putting their ballots and registration papers at the end of sticks and thus reached over the heads of those who stood between them and the window. The witnesses are not agreed about the number who thus voted. One witness.says about seventy-five, and another witness says about one hundred and eleven.
D. S. Yinson, a witness, swears as follows: “I observed nothing wrong, except the voting on sticks, and that was a new style to me; those voting on sticks were standing a distance from the window and reaching over the heads of others, who were close up to the window; I would have tried to vote in this way myself, if I could have got a stick ; those voting on a stick appeared to be in a hurry to vote.”
*512 P. B. Rhodes testified as follows: “I was one of the commissioners •of election at the voting precinct No. 1 of this parish, at the last •general election ; N. Burton was there during the day;. I did not hear him make any objections to the way the election was conducted; I heard him say four days after the election that the election was fairly -conducted, except, in his opinion, I made a mistake of eleven ballots In counting off against him, and two persons that were not allowed to vote, he thought would have voted for him if they had been allowed to vote. He made no objection, at the election, or after the counting of the votes, that I heard; the exact hight of the window where •the ballot box was placed is five feet nine inches; no one was compelled to vote on sticks; those persons who were anxious to vote for fear of not having time to vote, got sticks and placed their ballots on the ends of them, and handed them up to the commissioner; the smallest man that I know of could vote by handing his ballot up to the commissioners with his hand.”
This testimony is corroborated by S. J. G-albreth, S. P. Austin, W. W. Banham and E. Meyer, and is not contradicted in any material parts by any witness.
E. M. Spann testifies that he was a commissioner at ward No. 1. He says: “ Mr. Jackson and myself came to Providence with the first ward box and deposited said box in the clerk’s office ; the clerk of the court, Mr. Jackson, gave me his receipt for the box; we then went •over to Mr. Lockey’s office, and I believe Mr. Jackson gave him a copy •of the returns; Mr. Lockey then demanded the box, and Mr. Jackson and myself both refused to give said box to him.” * * I left him •and Lockey talking about the box, and I went down stairs; I saw Mr. Jackson afterward and asked him what he had done with the box, and •he told me he had deposited it with Mr. Anderson for safe keeping, ■and held his receipt for the same; this was Wednesday, after the election, about ten o’clock; the tally lists of ward one was in the box; the •ballots were in the box also.”
E. Meyer swears he was Deputy United States Supervisor at said precinct; I assisted in making out a list of the votes cast; the tally list was closed and signed about seven o’clock Tuesday evening; I left two of the tally sheets with the commissioners and I kept one ; I •was present from the time of my arrival until closing of the polls ; was .at the box all the time, except about half an hour at two different times; I watched the progress of the election closely ; had there been any fraud or malpractice in depositing the ballots in the box I would have seen it; there was no fraud nor malpractice in the voting, so far •as I know of; I did not see Mr. Jackson put in any wrong ballot, except that one voter handed up on a stick two tickets with his registra *513 tion paper, which dropped on the floor, and Jackson put in only one of the two; one of the tickets was a red and one was a white one, and he put in the red ticket.
' Mr. Jackson swears that “the election was carried on fairer than I ever saw it before; Mr. Burton, the candidate for sheriff, was present during the entire day, he was in the room all the time; I heard no complaint made by him whatever; he was there when we commenced counting the votes until we closed and' signed one of the tally lists, atad áfterward erased his name.”
'This is the sum and substance of the testimony on the subject of voting with sticks arid at the high window, and of the irregularities at said -election, except the testimony of two witnesses offered by the plaintiffs in regard to other illegalities.
Henry Atkins testifies as follows: I saw cine man cast more than one ballot on that day; he cast three to my knowledge, aridT asked him why he did it, and he said he was doing it for some other persons.
On cross-examination, he states: “The man who voted several times was Cain Sartain; Cain Sartain told me they were for other persons ; of these ballots the commissioners called names and passed back the registration paper's, and did not call Cain Sartain’s name ; I handed in tickets the same' as Sartain and the commissioners refused until I called their remembrance to Sartain, and they then allowed me to do the same ; I was a candidate on the opposite ticket.”
Caesar Johnson testified: “I saw ballots handed up very high; I could not see where they went to with the papers that were returned back; some had money returned with them ; some had one, some had two, and some three bills; I heard two cry out, Oh, Jackson greenbacks ; and when the papers came back they had greenbacks with them.” If testimony so absurd and incredible could demand any notice, it is sufficient to say that it is contradicted by nearly every witness who testified in regard to what occurred at that precinct. Mr. Burton, one of the plaintiffs, was at that precinct and near the box, and he has testified in this case, but he does not say a word about bribery; his testimony is in substance that he saw Mr. Jackson change one vote, -and that the window was six feet ten inches high where he measured it.
It is evident from the foregoing evidence that the irregularities shown thereby resulted from a want-of information on the part of the officers of the election, and that said irregularities did not in any manner affect the result of the election.
In regard to ward two the irregularities seem to be that one of the commissioners did not sign the returns, because he thought it was not necessary, and the correctness of the returns were not sworn to in the *514 presence of all the commissioners and the counting of the votes was not completed within twenty-four hours after the election.
At ward one the voting on sticks and at a high window, where the voter had to reach up to hand his ballot to the commissioner, was certainly novel; but the excuse for this is given in the foregoing evidence, and the.evidence leaves no doubt on our minds that the ballots were fairly deposited in the ballot box, that no fraud was perpetrated at the election, and that the votes were honestly counted.
The fact that the ballot box could not be seen by those voters, who stood near the window, can not be a cause to annul the election. In Augustin v. Eggleston, 12 An. 366, this court said: “ The mere position of an election box, without any resulting injury, does not avoid án election.”
Now, conceding what the defendants admitted, to avoid a continuance, that “ the returns, made out for the election in this parish, were not made out and sworn to as the law requires, and that the ballots for ward one will not show the same result as the returns, can that defeat an election in the parish? It has been often decided that the failure to comply with the directory clauses of an election law will not annul an election. Courts can not affix to the omission a consequence which the Legislature has not affixed. 9 An. 577; 10 An. 732; act of 1873, p. 15.
There is an essential difference between the act of voting and the police provisions to secure the evidence of the act. If the votes be deposited, the object of the election is attained, and its validity can not be affected by the non-observance of the directory provisions. 13 An. 801.
The act of 1873, No. 98, provides for the punishment of those who' violate its provisions, and the criminal courts of the State have cognizance of such matters. The law does not authorize the election to be set aside, except for fraud, intimidation, violence or corruption, at or before the election, and then only when such fraud, violence, intimidation, etc., had the effect to change the result of the election.” Errors of judgment are inevitable; but fraud, intimidation and violence the law can and should protect against.” Cooley’s Limitations, 621. The same author says: “When an election is thus rendered irregular, whether the irregularity shall avoid it or not must depend generally upon the effect the irregularity may have had in obstructing the complete expression of the popular will, or the production of satisfactory evidence thereof. Election statutes are to be tested like other statutes, but with a leaning to liberality, in view of the great public purposes which they accomplish; and except where they specifically provide that a thing shall be done in the manner indicated and not otherwise, *515 their provisions, designed merely for the information and guidance of the officers, must be regarded as directory only, and the election will not be defeated by a failure to comply with them, provided the irregularity has not hindered any one who was entitled from exercising the right of suffrage, or rendered doubtful the evidences from which the result was to be declared.” 618. And it was said in People v. Cook, 14 Barb. 259, and 8 N. S. 67, “that any irregularity in conducting an election which does not deprive a legal voter of his vote, or admit a disqualified voter to vote, or cast uncertainty on the result, and has not been occasioned by the agency of a party seeking to derive a benefit from it, should be overlooked in a proceeding to try the right to an office depending on such election. This rule is an eminently proper one, and it furnishes a very satisfactory test as to what is essential and what is not in election laws. And when a party contests an election on the ground of these or any similar irregularities, he ought to aver and be able to show that the result was affected by them.” Cooley’s C. Lim. 619; 13 An. 175.
The plaintiffs do not allege that they were elected; they do not allege or attempt to prove that the irregularities complained of changed the result of the election, and when the defendants offered to prove what the actual vote was at each precinct in the parish, as shown by the count of the votes at the polls, the plaintiffs objected on the ground that the ballot boxes were not produced, and this objection was sustained, notwithstanding the facts that the plaintiffs had alleged in their petition that the ballot, boxes had not been returned tp and kept in the clerk’s office as directed by law, and that plaintiffs had sworn that the ballot boxes had been so tampered with and the ballots so changed or altered as to render them unreliable.
Judge Cooley says : “ If, however, the ballots have not been kept as required by law, and surrounded by such securities as- the law has prescribed with a view to their safe preservation as the best evidence of the election, it would seem that they should not be received in evidence at all,” etc., 625. 14 Mich. 320,
The rejection of other evidence on account of the absence of the ballots, which would not be legal evidence if in court, was certainly very strange.
The conclusion we have come to renders it unnecessary to pass upon the exceptions of the defendants.
It is therefore ordered and adjudged that the verdict of the jury be set aside, that the judgment of the lower court be annulled, and that the plaintiffs’ suit be dismissed with costs.